**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| REPUBLIC TOBACCO, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 CV 3267 |
| | ) | |
| v. | ) | Honorable Rebecca R. Pallmeyer |
| | ) | |
| COMMONWEALTH BRANDS, INC., | ) | Magistrate Judge Martin C. Ashman |
| | ) | |
| Defendant. | ) | |

**MOTION TO STAY CASE
PENDING OUTCOME OF U.S.P.T.O. OPPOSITION PROCEEDING**

Defendant Commonwealth Brands, Inc., by its undersigned counsel, hereby moves for a

stay of this case pending resolution of the Consolidated Opposition Proceeding currently pending

before the United States Trademark Trial and Appeal Board, and in support hereof states as

follows:

**INTRODUCTION**

Plaintiff Republic Tobacco L.P. (hereinafter "Republic") and Defendant Commonwealth

Brands, Inc. (hereinafter "CBI") are direct competitors in the tobacco products industry.

Republic's Complaint is based on a prior Settlement Agreement and Republic's purported

trademark rights in the numerals "1.5" and "1.25" and is directed entirely to a single alleged

violation of the Settlement Agreement and Republic's alleged trademark rights by the use of

these numerals in a single sheet of advertising distributed to retailers at a trade show in April,

2008, in connection with CBI's "JOKER" brand of cigarette papers (Compl. Ex. G).

The Complaint was filed by Republic even though CBI advised Republic that though it

had the right to use 1.25 and 1.5 in their ordinary descriptive meaning, it had withdrawn the

sheet, that the use of the numerals was in fact inadvertent, and that it had asked its employees not to use the numerical descriptions.  Specifically, CBI advised Republic that "it was simply a sales person in the field that developed the piece for purposes of taking orders.  His use of the numerical designations was simply descriptive.  As you know, RBA, and now CBI has taken the position that the numerals in question can be used descriptively, however, we agree to refrain from the use of these numbers at this time and assure that the use in this instance was not intentional."  (Compl. Ex. H).

The Complaint was filed even though a motion for summary judgment on the issue of whether "1.25" and "1.5" for cigarette rolling papers are trademarks or even capable of being trademarks had been filed very recently (May 8, 2008) and is now pending in a proceeding before the Trademark Trial and Appeal Board (TTAB) which has been going on since October 15, 2003.  CBI's affiliate, Robert Burton Associates, Inc. ("RBA") filed an opposition to applications for registration of "1.25" and "1.5" for cigarette rolling papers that had been filed by Republic's affiliate, DRL Enterprises, Inc. ("DRL").  RBA filed its opposition to the registration of the numerals on the grounds that the terms were in the public domain, were commonly used in the cigarette rolling paper industry to describe the size of rolling papers, and should not and could not be claimed by DRL Enterprises Inc. as its exclusive property.

RBA has used the numerals "1.0", "11/4" and "11/2" for many years to describe the size of its rolling papers, and now these numerals are being used by CBI.  There are many others in the rolling paper industry that have also used "1.0", "1.25", "11/4", "1.5", "11/2", or "2.0" to describe the size of rolling papers.  Another cigarette rolling paper company, North Atlantic Operating Company, has also opposed DRL's applications for registration of the numerals 1.25 and 1.5, and that opposition, which was consolidated with its cancellation proceedings in

connection with DRL's registrations of "1.25 POINT" stylized and "1.5 POINT" stylized, is also pending before the TTAB.

A copy of the Motion for Summary Judgment (less exhibits) filed by RBA is attached hereto as Exhibit A.  The motion for summary judgment is based in large part on DRL's own legally binding admissions of the descriptiveness of 1.25 and 1.5, on extensive evidence of third party use of the terms in the rolling paper industry, and on a survey which shows that 86% of purchasers and likely purchasers of cigarette rolling papers view "1.25" and "1.5" as descriptive or as categories of cigarette rolling papers. As shown by the docket sheet which is attached hereto as Exhibit B, the filing of the motion for summary judgment followed a lengthy period of discovery that was both time consuming and costly.

In the face of an expected unfavorable outcome in the proceedings before the TTAB, Republic is forum shopping and attempting to generate a sham dispute over a single insignificant and inadvertent use of "1.25" and "1.5" despite CBI's statement that it would refrain from use. The purpose of the Complaint, which is completely without merit, is to suspend the proceedings before the Trademark Trial and Appeal Board to avoid an unfavorable outcome.  Attached hereto as Exhibit C is a copy of a letter sent to the Director of the U.S. Patent and Trademark Office.

Not only was the pretext for filing the Complaint, the inadvertent distribution of a single advertising sheet at a trade show, so flimsy that it is arguably not even a controversy, the claims of the Complaint itself are thin to the point of non-existence.  With respect to the claim of infringement, as Republic is well aware, DRL, the owner of the claimed marks "1.25" and "1.5" for cigarette rolling papers, has made legally binding admissions that the terms are inherently descriptive as used with cigarette papers.  Therefore, even if Republic could claim trademark rights in "1.25" and "1.5", as is immediately apparent from the advertising sheet (Compl. Ex. G)

that is the basis for the Complaint, CBI's use of the numerals was in their ordinary descriptive meaning and therefore a privileged fair use.  With respect to the alleged breach of contract, Republic likewise is aware that in the alleged Agreement RBA agrees as to "1.25" and "1.5" only not to "… make any *proprietary* use…" of the numerals (Comp. Ex. A ¶3) and also aware that the alleged Agreement specifically provides for the fair use of the numerals (id. ¶ 5).

Finally, the "promissory estoppel" claim is based on the false premises that RBA promised not to use the numerals "1.25" and "1.5" and that there was detrimental reliance by Republic.  In fact, as is evident from Exhibits B-F, the correspondence between RBA and Republic related to DRL's registered "1.25 POINT" stylized and "1.5 POINT" stylized marks. Although, as is evident from the face of these registrations (which include claims of "acquired distinctiveness" under Section 2(f) of the Trademark Act), even these stylized forms of the numerals with the word "POINT"  are acknowledged to be inherently descriptive, neither RBA nor CBI has ever used these stylized forms of the numerals either with or without the word "POINT".  However, RBA's position as to the numerals themselves was made clear by the filing of the Notice of Opposition in October, 2003.

Whether there are protectable trademark rights in the numerals "1.5" and "1.25" as used in connection with cigarette rolling papers should be decided by the TTAB, the agency created by Congress with special competence in this area of the law.  Republic has in effect asked for an advisory ruling from this Court.  There is certainly no prejudice to Republic if this litigation is stayed pending resolution of the TTAB Opposition proceeding.

**ARGUMENT**

This action should be stayed pending the disposition of the cross-motions for summary judgment before the TTAB under the doctrine of primary jurisdiction and under the particular

circumstances of this case, which involve a transparent effort to avoid summary judgment by raising claims that are thin to non-existent based on an inadvertent descriptive use of numerals in a single leaflet distributed at a trade show, a use which will not be repeated until there is a final resolution of the dispute between the parties on the issue of whether Republic/DRL can claim exclusive rights in functionally descriptive numerals that have been commonly used in the cigarette paper industry for many years to describe the size of cigarette papers.

### 1. The Primary Jurisdiction Doctrine Warrants a Stay.

The TTAB was established to determine and decide the respective rights to trademark registration. 15 U.S.C. § 1067. The Board is composed of the Director of the Patent and Trademark Office, the Commissioner for Patents, the Commissioner for Trademarks, and approximately fifteen administrative trademark judges appointed by the Director. *Id.* As of September 30, 2007, the TTAB had 7,683 Opposition proceedings pending before it. *See* U.S.P.T.O. Performance and Accountability Report Fiscal Year 2007, Table 23: Summary of Contested Trademark Cases, available on the U.S.P.T.O. website at www.uspto.gov/web/offices/com/annual/2007/50323_table23.html. On the other hand, as of September 30, 2007, this Court had 11 trademark cases pending. *See* Annual Report of the Director: Judicial Business of the United States Courts 2007, Table C-11: Intellectual Property Cases, Securities/Commodities/Exchanges Cases, and Bankruptcy Appeals Filed, Terminated and Pending, available at www.uscourts.gov/judbus2007/contents.html.

The TTAB has greater experience and expertise than most district court judges in determining whether proposed trademarks can be accorded trademark protection. Where, as in this case, "enforcement of a claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body" the primary

jurisdiction doctrine comes into play. *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956). The doctrine "determines whether the federal court will refrain from exercising its unquestioned jurisdiction over a dispute until after an administrative agency has resolved some question arising in the proceeding before the court." *United States v. Elrod*, 627 F.2d 813, 817 (7th Cir. 1980).

Application of the primary jurisdiction doctrine is a flexible process. The outcome depends upon the facts of each case, and the central question is "whether the reasons and purposes [the doctrine] serves will be aided by its application in the particular litigation." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956). The reasons and purposes served by the doctrine are (1) achieving uniformity in application of the law by allowing a specialized agency to determine certain types of administrative questions and (2) recognizing the expert and specialized knowledge of an agency. *Id.* Both of these purposes will be aided by application of the primary jurisdiction doctrine in this case.

Although this Court is surely competent to determine whether the numerals are generic or descriptive and whether they have acquired secondary meaning, such determinations are still within the special expertise of the TTAB. "The purpose of refraining under the doctrine of primary jurisdiction is so that a party may seek an initial ruling of an administrative tribunal, not because the agency is inherently superior in its ability to handle a problem, but because the court should have the advantage in reaching its determination of any contribution the agency can make in its field of expertise." *Lasco v. Koch*, 428 F. Supp. 468, 474 (S.D. Ill. 1977). Thus "[i]t is sufficient that an administrative agency's decision will ultimately be a material aid in resolving the pending litigation to invoke the doctrine of primary jurisdiction." *Nat'l Mktg. Consultants, Inc. v. Blue Cross and Blue Shield Ass'n*, No. 87C7161, 1987 U.S. Dist. LEXIS 10840, *5 (N.D.

Ill. Nov. 19, 1987) (*citing Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 305 (1973)).

The TTAB has expertise in determining entitlement to claim trademark rights and applying trademark laws regarding genericness, descriptiveness, and the acquisition of secondary meaning. It has spent five years assembling a detailed and voluminous record and complete legal briefs presenting the issues for decision. Therefore, given the TTAB's expertise and its familiarity with issues that, once decided, are likely to streamline the case or dispose of it, this Court should apply the primary jurisdiction doctrine and stay this case. *See Armand's Subway, Inc. v. Doctor's Associates, Inc.*, 604 F.2d 849, 203 U.S.P.Q. 241 (4th Cir. 1979); *see also Kemin Indus., Inc. v. Watkins Prods., Inc.*, 183 U.S.P.Q. 799 (D. Minn. 1974) ("While in this case there are issues that cannot be ruled upon by the Patent Office, the determination of the threshold question of the ownership of the mark lies particularly within their field of expertise ... . If the Patent Office rules in favor of defendant then, on the facts as they now stand, all other questions would seem to be moot."); *Sun Drop Sales Corp. v. Seminole Flavor Co.*, 159 F. Supp. 828, 116 U.S.P.Q. 341 (E.D. Tenn. 1958) ("Perhaps the Court may take jurisdiction merely to pass upon a question of registerability where no infringement is involved, but it appears advisable, and perhaps mandatory, in the present cases to defer action until the remedies available in the Patent Office have been exhausted. The Commissioner of Patents and his assistants are, being experts in this field, far better equipped to pass upon that question than this Court.").

> **2.     The Decision of the TTAB Will Bear Directly on the Issues Raised in this Action.**

To find that Republic's trademark rights have been infringed it is necessary to find first that Republic has trademark rights and, if Republic does have trademark rights, to find that CBI's use of the numerals was not a fair use. These issues will both be directly affected by the outcome of the proceeding before the TTAB which has been litigated for the past five years. If

the Board decides that the numerals are incapable of becoming marks or are descriptive but have not acquired distinctiveness, the second question is not reached. If the Board decides that the numerals are inherently descriptive (as has already been admitted by DRL) but have acquired distinctiveness, then the Court would reach the issue of whether CBI's use was a descriptive fair use.

The decision of the TTAB would likewise bear on the issue of whether there could be a breach of the Agreement. If the Board rules that "1.25" and "1.5" are functionally descriptive or generic terms that are incapable of becoming marks, then there can be no doubt that no use of the numerals by CBI (or any other company) could be the "proprietary use" which is precluded by paragraph 3, and even if an opinion and order merely confirms the inherent descriptiveness of the numerals, it will confirm the possibility of "fair use" contemplated in paragraph 5 of the Agreement.

Finally, with respect to the "promissory estoppel" claim, one issue included in the motion for summary judgment is whether DRL can claim distinctiveness as to the "1.25" and "1.5" numerals based on its use and registration of the "1.25 POINT" stylized and "1.5 POINT" stylized marks (Comp. Ex. B). If the TTAB agrees with RBA's argument that the registered "1.25 POINT" stylized and "1.5 POINT" stylized are materially different from the "1.25" and "1.5" non-stylized numerals and, therefore, that the stylized registered marks do not support a claim of rights in the non-stylized numerals, that finding by the TTAB will bear directly upon Republic's reliance on the 2001 correspondence, which relates solely to use of the registered marks, in support of their promissory estoppel claim.

Both this case and the TTAB Opposition proceeding hinge upon whether either of the entities, Republic or DRL, can claim trademark rights in numerals that are commonly used in the

industry and commonly recognized as describing the size of cigarette rolling papers or whether the numerals are, as CBI and RBA contend, functional terms incapable of becoming trademarks or, even if they are considered descriptive terms which are capable of becoming trademarks, certainly not terms which have been used exclusively or otherwise by DRL such that they have become its trademarks.[1]

### 3.    The Filing of the Complaint Is a Transparent Effort to Avoid a Decision on the Motion for Summary Judgment by the TTAB

Allowing the TTAB to decide whether the numerals are capable of becoming marks or, if they are, whether they are DRL's marks will further the goal of uniformity.  The TTAB is the judicial body that most frequently applies the trademark laws regarding whether terms are generic or descriptive and have acquired secondary meaning; that is a core Board function.  Thus, allowing the TTAB to perform its core function increases the likelihood that the outcome of the protectability determination will be consistent with the majority of its prior precedent on these issues.  Moreover, inconsistent rulings between Courts and administrative agencies on such basic issues as whether numerals are generic or descriptive and have acquired secondary meaning are clearly at odds with the policy of promoting uniformity in trademark law.

Staying this case will promote the "orderly coordination between the functions of the court and agency in securing objectives of their often overlapping competency."  *See Interstate Commerce Commission v. All-Am, Inc.*, 505 F.2d 1360, 1362 (7th Cir. 1974).  On the other hand, permitting transparent flanking maneuvers, like the one attempted here by Republic, will encourage parties in Opposition proceedings who become dissatisfied with the preliminary rulings from the TTAB or who face an expected unfavorable outcome to file declaratory

---

[1] DRL sought registration of the numerals under Section 2(f) and thus admits the descriptiveness of the proposed marks but contends that they have acquired secondary meaning.

judgment actions in the district courts.  That is exactly what is happening here, and it undermines the role of the TTAB in determining the initial issue of whether the numerals can be or are marks.  It is no coincidence that this lawsuit was filed after years of administrative proceedings and immediately after RBA submitted its cross-motion for summary judgment in the Opposition.

There is no urgency here.  The documents attached to Republic's Complaint, as well as Commonwealth's Counterclaim, make it clear that CBI does not intend to use the numerals at issue in connection with its rolling papers until a decision on whether those numerals are trademarks has been made. (Comp. at Ex. H.)  "'The declaratory judgment procedure will not be used to pre-empt and prejudge issues that are committed for initial decision to an administrative body or special tribunal … Responsibility for effective functioning of the administrative process cannot be thus transferred from the bodies in which Congress has placed it to the courts.'"  *Nat'l Mktg. Consultants, Inc. v. Blue Cross and Blue Shield Ass'n*, No. 87C7161, 1987 U.S. Dist. LEXIS 10840, *6-7 (N.D. Ill. Nov. 19, 1987) (*quoting Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 246-247 (1952)).  If this Court proceeds with this case it will "frustrate the delicate balance envisioned by Congress between the court and the TTAB."  *Id.*

The claims raised by Republic in its effort to avoid a decision by the TTAB are transparently thin.  As stated above, it is evident from Republic's own admissions of the inherent descriptiveness of the numerals and the advertisement itself that CBI was using the numerals descriptively and that the use was a protected fair use.  It is likewise evident from the advertisement itself that it is not a "proprietary use" in breach of the Agreement, and the use is very clearly not the use of the registered marks that is the subject of the correspondence on which Republic relies for its "promissory estoppel" claim.  Further, there was no promise or agreement to permanently desist from use, and Republic was put on notice that RBA did not

accept Republic's or anyone's claims of rights in the numerals themselves by the filing of an opposition to DRL's applications in 2003.

    **4.**    **This Court Should not Exercise Subject-Matter Jurisdiction Over the State Law Claims.**

As this Court itself noted [Dkt. # 8], Republic's allegations fail to set forth a basis for diversity jurisdiction because Republic fails to state the citizenship of its members. Republic also fails to state an amount in controversy.

In the absence of diversity jurisdiction the only basis for this Court to exercise subject-matter jurisdiction over the breach of contract and promissory estoppel claims is pursuant to the supplemental jurisdiction statute, 28 U.S.C. 1367(a). Under circumstances such as these, however, this Court should decline to exercise supplemental jurisdiction over the breach of contract and promissory estoppel claims. It is the well settled law of this Circuit that when federal claims are dismissed the settled practice is to dismiss without prejudice state supplemental claims. *Stewart v. Harrah's Ill. Corp.*, 2001 U.S. Dist. LEXIS 13949 at *11-12 (N.D. Ill. Sept. 4, 2001) (*citing Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999)).

A stay of the federal claims warrants the same treatment of the supplemental state claims. If the federal claims "drop out" before trial, substantial federal judicial and party resources have not been expended and so the economies of retaining jurisdiction over the state law claims are slight. *Williams Elecs. Games Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). Dismissal of the federal claims is not an absolute requirement. *Dargis v. Sheahan*, 526 F.3d 981, 991 (7th Cir. 2008).

Because this Court lacks diversity subject-matter jurisdiction over the state law breach of contract and promissory estoppel claims, and it is appropriate to decline to exercise supplemental

subject-matter jurisdiction, this Court should rebuff Republic's obvious efforts to include those claims in the Complaint in anticipation of CBI's motion to stay.

## CONCLUSION

After five years of litigation before the TTAB which relate directly to Republic's claim of rights in "1.25" and "1.5" and the filing of a motion for summary judgment which should determine whether Republic can claim any such rights, Republic ought not be permitted to succeed in its effort to by-pass the TTAB with a make-shift claim based on a single inadvertent (but fully privileged) descriptive use of numerals in a leaflet handed out at a trade show. The TTAB's decision on whether "1.25" and "1.5" can be claimed as marks by DRL will materially aid this court in its assessment of Republic's claims.  The primary jurisdiction doctrine, considerations of judicial economy, and Republic's inability to identify any prejudice it would suffer as a result of the stay, weigh in favor of CBI's motion to stay the present litigation pending the TTAB's decision on the cross-motions for summary judgment.

Respectfully Submitted,

s/ Michael P. Padden
Michael P. Padden
Howrey LLP
321 North Clark Street
Suite 3400
Chicago, Illinois 60658
Tel. (312) 595-1149
Fax: (312) 595-2250

Attorneys for Defendant,
Commonwealth Brands, Inc.
And

Robert E. Scully, Jr.
(*pro hac vice* application pending)
Brewster B. Taylor
(*pro hac vice* application pending)

Emily Harwood Smith
(*pro hac vice* application pending)
Stites & Harbsion PLLC
1199 N. Fairfax Street
Suite 900
Alexandria, Virginia 22314
Tel. (703) 739-4900
Fax: (703) 739-9577

Attorneys for Defendant,
Commonwealth Brands, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I, Michael P. Padden, counsel for Defendant Commonwealth Brands, Inc., hereby certify that a copy of the foregoing Motion to Stay Pending Outcome of USPTO Opposition Proceeding, was served via electronic mail on this 5th day of August, 2008 upon each of the following counsel of record:

> Charles Bergen
> Grippo & Elden
> 111 S. Wacker Drive
> Chicago, Illinois 60606
> cbergen@grippoelden.com
>
> Peter S. Roeser
> proeser@grippoelden.com

> s/ Michael P. Padden
> Michael P. Padden

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

ESTTA Tracking number: **ESTTA208684**

Filing date: **05/01/2008**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
### BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| | |
|---|---|
| Proceeding | 91158493 |
| Party | Plaintiff<br>Robert Burton Associates, Ltd |
| Correspondence Address | BREWSTER TAYLOR<br>STITES & HARBISON, PLLC<br>Transpotomac Plaza , 1199 North Fairfax St; Ste 900<br>Alexandria, VA 22314<br>UNITED STATES<br>btaylor@stites.com |
| Submission | Other Motions/Papers |
| Filer's Name | BREWSTER TAYLOR |
| Filer's e-mail | BTAYLOR@STITES.COM |
| Signature | /bt/ |
| Date | 05/01/2008 |
| Attachments | OPPOSERS OPP TO APPL MOT FOR PART SUMM JUDG.pdf ( 34 pages )(1559475 bytes )<br>Exhibit 1.pdf ( 4 pages )(175347 bytes )<br>EXHIBIT 2.pdf ( 4 pages )(2034345 bytes )<br>EXHIBIT 3.pdf ( 6 pages )(213181 bytes )<br>EXHIBIT 4.pdf ( 10 pages )(450438 bytes )<br>EXHIBIT 5.pdf ( 7 pages )(261368 bytes )<br>EXHIBIT 6.pdf ( 64 pages )(10835283 bytes ) |

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
**BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD**

IN THE MATTER OF TRADEMARK
APPLICATION SERIAL NOS. 76/296,942;
76/369,872; 76/296,931; 78/157,851;
76/296,945; 76/296,926

| | | |
|---|---|---|
| ROBERT BURTON ASSOCIATES, LTD. | ) | |
| | ) | |
| Opposer | ) | |
| | ) | |
| v. | ) | **Opposition No. 91158493** |
| | ) | |
| DRL ENTERPRISES, INC. | ) | |
| | ) | |
| Applicant | ) | |
| | ) | |

**OPPOSER'S OPPOSITION TO APPLICANT'S MOTION FOR PARTIAL SUMMARY**
**JUDGMENT AND OPPOSER'S CROSS-MOTION FOR PARTIAL SUMMARY**
**JUDGMENT**

MAY 1, 2008

Brewster Taylor
STITES & HARBISON PLLC
1199 North Fairfax Street
Suite 900
Alexandria, VA 22314

Amy S. Cahill
STITES & HARBISON PLLC
400 West Market Street, Suite 1800
Louisville, Kentucky 40202

Attorneys for Opposer

Page

### TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................... 2

II.    STATEMENT OF FACTS....................................................................... 5

III.   ARGUMENT............................................................................................ 7

    A.   Summary Judgment in Favor of DRL Cannot Be Granted on the Basis that the  Numerals Have Not Yet Been Used for Cigarettes................................... 7

    B.   Summary Judgment is Appropriate in Trademark Cases Before the Board.......... 9

    C.   DRL's Applications Should Be Refused Registration Because the Numerical Size Designations Are Not Capable of Functioning As Trademarks .................................................................................................... 9

    D.   Even if the Numerical Size Designations Were Capable of Becoming Trademarks They Have Not Become Trademarks............................................... 12

        1.   The Trademark Office Had Substantial Evidence that the Numerical Terms Were Not Distinctive .................................................. 13

        2.   RBA's Expert Survey Proves that the Plain Numeric Designations Are Understood by Purchasers and Prospective Purchasers as Being Descriptive of Cigarette Papers or As Indicating the Category of Cigarette Papers ....................................................................... 14

        3.   DRL Cannot Claim Acquired Distinctiveness Based on the Use and Registration  of Materially Different Marks ...................................... 15

        4.   DRL Itself Uses Numerals to Indicate the Size of Cigarette Papers........ 16

        5.   RBA Also Uses Numerals to Indicate the Size of  Cigarette Papers ....... 18

        6.   Numerals Are Otherwise Commonly Used in the Industry Use to Indicate the Relative Sizes of Cigarette Papers ....................................... 19

        7.   DRL's Efforts to Prevent Fair Use of the Numerical Designations Have Not Been Successful.................................................................... 22

IV.    CONCLUSION .................................................................................... 23

LIST OF APPENDICES.................................................................................. 25

    APPENDIX A (List of Exhibits)................................................................... 26

    APPENDIX B (Graphical Representations of Applicant's Stylized Marks................ 28

    APPENDIX C (List of Recipients of DRL's Cease and Desist Correspondence)...........29

    APPENDIX D (Exhibits 1-9)...........................................................................31

Page

# TABLE OF AUTHORITIES

**CASES**

*H. Marvin Ginn Corp. v. International Association of Fire Chiefs, Inc.,*
    228 U.S.P.Q. 528 (Fed. Cir. 1986))................................................................... 7

*In re. National Shooting Sports Foundation, Inc.,* 219 USPQ 1018,
    (TTAB 1983)................................................................................................ 8

*Sweats Fashions v. Pannill Knitting Co.,* 833 F. 2d 1560, 4 USPQ 2d 1793,
    (Fed. Cir. 1987)............................................................................................ 9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...................................................... 9

*Yamaha Int'l Corp. v. Hoshino Gakki Co., Ltd.,* 840 F.2d 1572 (Fed. Cir. 1988)..............10

*J. Kohnstam, Ltd. v. Louis Mark & Co.,* 280 F.2d 437,
    126 USPQ 362 (C.C.P.A. 1960)....................................................................11

*A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 1 U.S.P.Q. 2d 1364 (3rd Cir. 1986)...........11

*In re Boston Beer Co,* 47 U.S.P.Q. 2d 1914 (TTAB 1998)
    *aff'd* 198 F. 3d 1370, 53 U.S.P.Q. 2d (BNA) 1056 (Fed. Cir. 1999).....................11

*King-Size, Inc. v. Frank's King Size Clothes, Inc.,*
    216 USPQ 426, 547 F.Supp. 1138 (S.D. Tx. 1982).........................................11

*In re Bongrain Int'l (Am.) Corp.,* 13 USPQ2d 1727, (Fed. Cir. 1990)....................12

*In re The Deister Concentrator Co, Inc.,* 129 USPQ 314, (CCPA 1961)...................12

*In Re Bongrain International (American) Corp.,*
    894 F. 2d 1316, 13 U.S.P.Q. 2d 1727 (Fed. Cir. 1990)....................................12

*Anheuser-Busch, Inc. v. The Stroh Brewery Co.,* 224 USPQ 657 (8th Cir. 1984)...............14

*McDonough Power Equipment, Inc. v. Weed Eater, Inc.,* 208 USPQ 676 (TTAB 1981).......14

*J & J Snack Foods v. McDonald's Corp.,* 18 USPQ2d 1889 (Fed. Cir. 1991)...................15

*In re Best Software Inc.,* 63 USPQ2d 1109, (TTAB 2002)...................................16

**Page**

*In re Save Venice New York, Inc.,* 59 USPQ 2d 1778
        259 F.3d 1346 (Fed. Cir. 2001)..............................................................16

*King-Size, Inc. v. Frank's King Size Clothes, Inc.,*
        547 F. Supp. 1138, (S.D. Tex. 1982)...........….........................................18

*In re Union Oil Co. of Ca.*, 33 USPQ 43, 24 CCPA 987, (CCPA 1937)............…..............19

**RULES**

*Trademark Trial and Appeal Board Manual of Procedure (TBMP)* § 528.01....................9

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD**

**IN THE MATTER OF TRADEMARK
APPLICATION SERIAL NOS. 76/296,942;
76/369,872; 76/296,931; 78/157,851;
76/296,945; 76/296,926**

| | | |
|---|---|---|
| ROBERT BURTON ASSOCIATES, LTD. | ) | |
| | ) | |
| Opposer | ) | |
| | ) | |
| v. | ) | **Opposition No. 91158493** |
| | ) | |
| DRL ENTERPRISES, INC. | ) | |
| | ) | |
| Applicant | ) | |
| | ) | |

## OPPOSER'S OPPOSITION TO APPLICANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSER'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

This brief in opposition to Applicant's Motion for Partial Summary Judgment (hereinafter "Applicant's Motion") and cross –motion for partial summary judgment is filed by Opposer **ROBERT BURTON ASSOCIATES, LTD,** (hereinafter "RBA") is pursuant to 37 CFR §2.127 and Federal Rule of Civil Procedure 56. RBA offers evidence in the form of attached declarations, its expert survey results, and documentary exhibits in support of its cross-motion and opposition that prove that the alleged marks of Applicant **DRL ENTERPRISES, INC.** (hereinafter "DRL") in Application Serial Nos. 76/369,872 ("1.25" for "cigarette rolling papers"), 78/157,851 ("1.5" for "cigarette rolling papers"), 76/296,942 ("1.0" for cigarettes), 76/296,931 ("1.25" for cigarettes), 76/296,945 ("1.5" for cigarettes), and 76/296,926 ("2.0" for cigarettes) should be refused registration under the Trademark Act.

1

## I.    INTRODUCTION

RBA's opposition to registration of plain numerals for cigarette papers and cigarettes is based on the fact that the ordinary numeric terms in which DRL has sought to claim trademark rights are and for many years have been functionally used in the industry to indicate the approximate size of cigarette rolling papers within their respective lines and would also therefore be descriptive or misdescriptive as used in connection with cigarettes.

DRL had been able to obtain registrations of "1.0 POINT" stylized (with a disclaimer of "1.0") in 1988 and of "1.25 POINT" stylized and "1.5 POINT" stylized (with uncontested claims of acquired distinctiveness under Section 2(f)) in 1984 (Reg. Nos. 1,481,006; 1,328,866; and 1,331,207). Although these registrations constituted DRL's legal admission that the numerals were descriptive even then, as illustrated by the attached Ex. 8 (which consists of selected "cease and desist" letters produced by DRL relating to its "enforcement" efforts), DRL has thereafter over the course of many years engaged in a pattern of seeking to gain an unfair advantage in the industry by using its registrations as clubs to prevent the fair and descriptive use by others of plain numerals to describe size.

DRL's filing of new applications to obtain registration of the plain numerals represents a further effort to leverage its registrations of stylized numerals with the word "POINT" to gain an unfair advantage over its competitors. These new applications were passed for publication even though DRL admitted in the applications that its own claimed numerals indicate the "approximate size range of Applicant's goods" (e.g. p. 4 of Response filed on March 22, 2002, in application Serial No. 76/296,931 for "1.25" for "cigarettes") and the Trademark Office independently had substantial Internet evidence of the descriptive use of the numerals by third parties and understood that e.g. "[t]he numeral 1.25 immediately informs the consumer that 'the

2

papers are slightly bigger than the applicant's 1.0 papers'" (Office Action dated July 12, 2002, p. 2 referring to DRL's own statements. See also e.g. the file histories of application serial nos. 76/296,942 for "1.0" for "cigarettes" and 76/296,926 for "2.0" for "cigarettes").

DRL's two applications for registration of "1.25" and "1.5" for "cigarette papers" were based on a claim of acquired distinctiveness under Section 2(f) , relying on specimens showing the use of the registered "1.25 POINT" stylized and "1.5 POINT" stylized marks. (There is no evidence in any of the files of the use by DRL of the plain numerals.) The four applications for registration of "1.0", "1.25", "1.5", and "2.0" for "cigarettes" were based on "intent to use", but DRL argued that the numerals had acquired distinctiveness as marks pursuant to Section 2(f) of the Trademark Act because they were "legally equivalent" to the prior used and registered marks of "1.0 POINT" stylized, "1.25 POINT" stylized, and "1.5 POINT" stylized and had become distinctive by virtue of the use of those marks for cigarette papers (see e.g. Response dated March 22, 2002, p. 5 in U.S. Application Serial No. 76/296,926).

RBA filed a Notice of Opposition and later filed a motion for summary judgment which was based on overwhelming Internet evidence of the functional use in the industry of "1.0", "1.25" and "1.5" (as well as of numeric and word equivalents) to describe the size of rolling papers, on declarations from DRL's two main competitors (RBA and NAOC, which also brought opposition proceedings as well as cancellation proceedings against the registered marks), and on DRL's legal admissions in its registered marks and its counsel's own admissions in the applications that the numerals indicated the "approximate size range of Applicant's goods".

RBA argued in its motion for summary judgment (1) that since the numerals were legally admitted to be descriptive of size they were incapable of becoming marks, (2) that registration and claims of distinctiveness under Section 2(f) for the plain numerals "1.25" and "1.5" for

3

"cigarette papers" could not be based on use and registration of "1.25 POINT" stylized and "1.5 POINT stylized" for cigarette papers" and (3) that even if the functionally descriptive numerals were considered capable of becoming marks, since there was no evidence of use of the plain numerals by DRL and since there was overwhelming evidence of third party use of the plain numerals and their numerical equivalents to describe the size of cigarette papers, the plain numerals could not possibly be considered to have acquired distinctiveness as DRL's marks.

As is evident from the attached Ex. 8, following the denial of RBA's motion for partial summary judgment, DRL has been very active (often successfully) in intimidating others into ceasing fair use of the plain numerals. However, since the numerals have been used in the industry to describe size since long before DRL began to claim exclusive rights, the purchasing public still considers the numerals to be descriptive. The expert survey report attached as Ex. 9 shows that 86% of those surveyed still think the terms "1.0", "1.25" and "1.5" are categories or descriptive as used in connection with cigarette rolling papers.

Further, as shown by the declaration and Internet evidence attached as Ex. 7, despite DRL's unfair anti-competitive efforts over the course of decades, there is still massive third party use of numerals descriptively in connection with rolling papers. As shown by the file histories of DRL's applications as well as by DRL's advertising attached as Ex. 2 and the testimony of DRL's designated rule 30(b)(6) deponents attached as Exhibits 1 and 3, DRL itself understands and uses the numerals descriptively.

There is no genuine issue of material fact as to the descriptive nature of the numerals. The numerals have been legally admitted to be descriptive of size and are functional and incapable of becoming trademarks. Further, even if the plain numerals were capable of becoming marks through acquired distinctiveness, there can be no genuine issue of material fact

4

as to the lack of acquired distinctiveness for the plain numerals both because (1) the expert

survey report shows that 86% of the purchasing public believes that the numerals are descriptive

(2) there is virtually no evidence of use by DRL of the plain numerals as purported marks in

connection even with cigarette papers and no evidence at all of use of the numerals for cigarettes

and (3) there is overwhelming evidence of continuing descriptive use of the numerals and their

equivalents by third parties in connection with cigarette rolling papers despite DRL's efforts to

prevent fair use.

## II.    STATEMENT OF FACTS

1.  Such numerals as "1.0", "1.25", "1 ¼", "1.5", "1 ½" , and "2.0" have been used

functionally as approximate size designations within a range for years by manufacturers of

cigarette rolling papers, with "1.0 indicating the smallest or "single width" size within a range,

2.0 indicating a largest or "double-width" within a range, and with "1.25" or "1 ¼" and "1.5" or

"1 ½" indicating progressively larger sizes falling between the "1.0" and "2.0" sizes.

2.  RBA has used the numerical designations "1.0", "1 ¼", and "1 ½" for many years on

cigarette rolling papers, and have also used "2.0" on packaging for cigarette rolling papers.[1]

3.  Retailers and wholesalers have consistently advertised the cigarette rolling papers of

RBA and of a number of other cigarette rolling paper manufacturers using the numerical size

designations "1.0", "1 ¼", "1.25", "1 ½" , and "1.5" and have often used the size designations

"1.25" and "1.5" interchangeably with their fractional equivalents "1 ¼" and  "1 ½".

4.  DRL legally admitted in the prior registrations that the numerals were inherently

descriptive of cigarette rolling papers because it disclaimed "1.0" apart from the mark in its

---

[1] RBA is the owner of registrations of "E-Z WIDER 1.0" for cigarette paper (Registration No. 1,399,772), "JOKER 1.0" for cigarette paper (Registration. No. 1,339,770), "E-Z WIDER 2.0" for cigarette paper (Registration No. 1,399,771), and "JOKER 2.0" for cigarette paper (Registration No. 1,399,769).  All of said registrations include disclaimers of the descriptive numeral designations.

registration of "1.0 POINT" (stylized) for "cigarette papers" (Registration No. 1,481,006), and its separate registrations of "1.25 POINT" (Stylized) for "cigarette papers" (Registration No. 1,328,866) and "1.5 POINT" (Stylized) for "cigarette papers" (Registration No. 1,331,207) it obtained registration based on claims of acquired distinctiveness under Section 2(f) of the Trademark Act.

5.   DRL has admitted that the plain numerals in its current applications are descriptive. DRL's applications for registration of 1.25 for "cigarette rolling papers" (Serial No. 76/369,872) and 1.5 for "cigarette rolling papers" (Serial No. 78/157,851) were filed with a claim of use in commerce and of acquired distinctiveness under Section 2(f) of the Trademark Act. Both the claims of use and the claims of acquired distinctiveness were based on the uses of the separately registered "1.25 POINT" (Stylized) and "1.5 POINT" (Stylized) respectively for cigarette rolling papers ("stylized marks"). *See* Appendix B for graphical representations of stylized marks.

6.   DRL admitted in prosecuting its applications for registration of the plain numerals for *cigarettes* i.e. "1.0", "1.25", "1.5", and "2.0" (Serial Nos. 76/296,942, 76/296,931, 76/296,945, and 76/296,926) that the numerals suggest to consumers "the approximate size range of Applicant's goods" and argued that the plain numerals had acquired distinctiveness as marks pursuant to Section 2(f) of the Trademark Act because they were the "legal equivalent" of prior registered stylized marks containing the word "POINT" for "cigarette papers" and had become distinctive by virtue of the use of those marks for cigarette papers.

7.   DRL has itself used the numerals descriptively in its advertising, and its designated witnesses under Rule 30(b)(6) have admitted that the numerals are descriptive.

6

8. RBA's consumer survey shows that 86% of consumers perceive the numeric designations "1.0", "1.25" and "1.5", as used with cigarette rolling papers as either "categories" or "descriptive".

## III.    ARGUMENT

### A.    Summary Judgment in Favor of DRL Cannot Be Granted on the Basis that the Numerals Have Not Yet Been Used for Cigarettes.

DRL has moved for partial summary judgment with respect to the issue of the descriptiveness or misdescriptiveness on the four applications for registration of the numerical marks "1.0", "1.25", "1.5" and "2.0" for "cigarettes" on the basis that "[i]f the designations 1.0, 1.25, 1.5 and 2.0 have not been used in connection with cigarettes then they cannot be found to merely describe or deceptively misdescribe the sizes of cigarettes" (Applicant's Motion, p. 6, citing *H. Marvin Ginn Corp. v. International Association of Fire Chiefs, Inc.,* 228 U.S.P.Q. 528, 530 (Fed. Cir. 1986)).

DRL has misunderstood the test of descriptiveness. As stated in the Trademark Office Manual of Examining Procedure:

> To be refused registration on the Principal Register under §2(e)(1) of the Trademark Act, 15 U.S.C. §1052(e)(1), a mark must be merely descriptive or deceptively misdescriptive of the goods or services to which it relates. A mark is considered merely descriptive if it describes an ingredient, quality, characteristic, function, feature, purpose or use of the specified goods or services…It is not necessary that a term describe all of the purposes, functions, characteristics or features of a product to be considered merely descriptive; it is enough if the term describes one significant function, attribute or property. TMEP §1209.01(b) ("Merely Descriptive Marks")

RBA has overwhelming evidence, including expert survey evidence, of the functionally descriptive nature of numerals as used in connection with cigarette papers. Since numerals are descriptive of a feature of cigarettes i.e. the size of the papers used to make cigarettes, they will be descriptive or misdescriptive to prospective purchasers as used in connection with cigarettes. It does not matter if DRL will be the first to use the descriptive numerals with cigarettes. *See*

7

*e.g. In re. National Shooting Sports Foundation, Inc.*, 219 USPQ 1018, 1020 (TTAB 1983).

DRL legally admitted that the numerals it uses for cigarette papers (numerals in stylized form and including the word "POINT") were inherently descriptive of the size of the papers. That is, its registration of "1.0 POINT" stylized for cigarette papers (Reg. No. 1,481,006) includes a disclaimer of "1.0" and its registrations of "1.25 POINT" stylized and "1.5 POINT" stylized for cigarette papers (Reg. Nos. 1,328,866 and 1,331,207) are both registered under Section 2(f). The files of its current applications, its advertising, and the depositions of its designated rule 30(b)(6) witnesses, an expert's survey report, and current evidence of extensive third party use, show that the numerals are still descriptive of the approximate size of cigarette papers.

Since the numerals are descriptive of the size of cigarette papers, they will be descriptive or misdescriptive to prospective purchasers of cigarettes. Further, DRL admitted in prosecuting its applications for registration of the numerals for *cigarettes* that the numerals suggest to consumers "the approximate size range of Applicant's goods". See e.g. p. 4 of Response dated March 22, 2002, in application serial no. 76/296,926 ("2.0" for "cigarettes"). In attempting to overcome the refusal to register its applications for registration of numerals for cigarettes, DRL argued that the numerals had acquired distinctiveness as marks pursuant to Section 2(f) of the Trademark Act because somehow the plain numerals for "cigarettes" were the "legal equivalent" of the prior used and registered stylized marks containing the word "POINT" for "cigarette papers". See e.g. Id. p. 5. Response dated March 22, 2002, p. 5 in U.S. Application Serial No. 76/296,926).

8

There is no basis in fact or law for DRL's motion for summary judgment on the issue of descriptiveness of the numerals for "cigarettes" because the numerals "have not yet been used on cigarettes".

**B.    Summary Judgment is Appropriate in Trademark Cases Before the Board**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate in circumstances in which "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Summary judgment is properly regarded not "as a disfavored procedural shortcut. Rather, the Court has counseled that summary judgment is a salutary method of disposition 'designed to secure the just, speedy and inexpensive determination of every action.'" *Sweats Fashions v. Pannill Knitting Co.,* 833 F. 2d 1560, 1562, 4 USPQ 2d 1793, 1795, (Fed. Cir. 1987).

"Consequently, the Board does not hesitate to dispose of cases on summary judgment when appropriate." *Trademark Trial and Appeal Board Manual of Procedure (TBMP)* § 528.01 and cases cited therein. In *Sweats Fashions,* the Federal Circuit affirmed the Board's granting of summary judgment because the evidence supported the Board's conclusion that there was no genuine dispute over the generic or highly descriptive nature of the word "sweats" as used in connection with sweatshirts and sweatpants. *Id.* , 833 F. 2d at 1564-65, 4 USPQ 2d at 1797.

**C.    DRL's Applications Should Be Refused Registration Because the Numerical Size Designations Are Not Capable of Functioning As Trademarks**

In its Notice of Opposition, RBA alleged that the numerical terms which DRL seeks to register are in the "public domain" and "cannot function to identify or become distinctive of

Applicant's products" since the terms have been and are used by others for identical products to indicate relative sizes within a range. (Notice of Opposition, ¶¶ 8 and 9).

The registrations of "1.0 POINT" (stylized), "1.25 POINT" (stylized), and "1.5 POINT" (stylized), contain DRL's legal admissions that the numerals are inherently descriptive as used with cigarette papers. The registration of "1.0 POINT" stylized contains an explicit disclaimer of the exclusive right to use "1.0" apart from the mark, and where (as in the registrations of "1.25 POINT" stylized and "1.5 POINT" stylized) an applicant seeks a registration based on acquired distinctiveness under Section 2(f), the Lanham Act accepts a lack of inherent distinctiveness as an established fact. *Yamaha Int'l Corp. v. Hoshino Gakki Co., Ltd.*, 840 F.2d 1572, 1577 (Fed. Cir. 1988).

The files for DRL's current applications show that it applied for registration of the plain numerals "1.25" and "1.5" for "cigarette papers" based on claims of acquired distinctiveness under Section 2(f) (based on the use and registration of "1.25 POINT" stylized and "1.5 POINT" stylized marks) and that, while it admitted in prosecution of the applications that the numerals indicated the "approximate size range of Applicant's goods", it argued for registration of the plain numerals "1.0", "1.25", "1.5", and "2.0" on the basis that they should be registrable on the basis that they were the "legal equivalents" of its registered stylized marks containing the word "POINT" for cigarette papers.

The evidence submitted herewith in the form of an expert survey report, documentary exhibits of third party use, deposition testimony, and declarations leave no doubt that the numerical designations remain descriptive of the size of cigarette papers (and therefore also of cigarettes). Manufacturers and sellers should remain free to continue using such size designations as they already have for many years.

10

The law is clear that terms that identify sub-categories of products are incapable of functioning as marks. *McCarthy, supra.* § 12:10 at 12-24, citing e.g. *J. Kohnstam, Ltd. v. Louis Mark & Co.*, 280 F.2d 437, 126 USPQ 362 (C.C.P.A. 1960). In *Kohnstam,* the Court held that "MATCHBOX" was generic for a genus of toy cars sold in matchbox-sized boxes, despite a period during which the alleged mark owner was the only user of the term, noting that "such circumstance cannot take the common descriptive name of an article out of the public domain and give the temporarily exclusive user of its exclusive rights to it, no matter how much money or effort it pours into promoting the sale of the merchandise." *Id.*, 280 F.2d at 1084, 126 USPQ at 364.

The opposed numeric designations communicate functional information about the products so directly and explicitly that they are "so descriptive as to be generic," and it would be wrong to allow a manufacturer to monopolize such functional terms and to give it an unfair advantage over its competition. *Id.* at 12-26, citing *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 1 U.S.P.Q. 2d 1364 (3rd Cir. 1986). The Board has held that some terms are so highly descriptive that even though they are not generic they should not be registered even upon a showing of secondary meaning. *In re Boston Beer Co*, 47 U.S.P.Q. 2d 1914 (TTAB 1998) *aff'd* 198 F. 3d 1370, 53 U.S.P.Q. 2d (BNA) 1056 (Fed. Cir. 1999).

Although the numeric designations do not correspond to exact dimensions and are not used to convey identical dimensions across brands of cigarette papers, they are nonetheless functionally descriptive. For example, "king size" immediately conveys information about the size of a product, namely, that it is "larger than normal or larger than the standard size." *King-Size, Inc. v. Frank's King Size Clothes, Inc.*, 216 USPQ 426, 547 F.Supp. 1138 (S.D. Tx. 1982) (holding "king size" descriptive of larger than normal size products). Size variations within an

11

industry do not render descriptive terms registrable: "It would be intolerable sophistry if a seller such as [applicant] could escape the unregistrability of a merely descriptive mark by simply increasing the size of its package." *In re Bongrain Int'l (Am.) Corp.*, 13 USPQ2d 1727, 1728–29 (Fed. Cir. 1990).

Size is of particular importance in the rolling paper industry because size is a functional characteristic which forms part of a consumer's purchasing criteria. As admitted by DRL, consumers select differently-sized rolling papers as "a matter of taste and ability." (Gold Dep., p. 78, ln. 19–p. 79, ln. 21, Ex. 1.) That is, consumers choose different-sized papers "for the ease and taste of smoking with them." Gold Dep. p.79, lns. 17–18, Ex. 1. Thus, size categories of rolling papers affect the product's performance and contribute to the "effectiveness or the ease with which it serves its function." *See In re The Deister Concentrator Co, Inc.*, 129 USPQ 314, 319–20 (CCPA 1961) (defining unregistrable functional matter under Lanham Act section 2(e)(5) to include "the shape, size, or form of an article which contributes to its utility, durability or effectiveness or the ease with which it serves its function."). The numeral size designations which DRL is seeking to register are unregistrable functional matter.

**D.    Even if the Numerical Size Designations Were Capable of Becoming Trademarks They Have Not Become Trademarks**

Even if the numeric designations were, in theory, registrable upon a sufficient showing of secondary meaning, RBA's expert survey, deposition testimony, declarations, and current evidence of third party use all show that the numeric size designations have not acquired distinctiveness as marks. *Cf. In Re Bongrain International (American) Corp.*, 894 F. 2d 1316, 13 U.S.P.Q. 2d 1727 (Fed. Cir. 1990) (Federal Circuit affirmed the Board's decision that "BABY BRIE" was unregistrable for cheese since evidence showed that "BABY" was used as a size

12

indicator and that the evidence of secondary meaning was insufficient to show that "BABY

BRIE" had become distinctive as a mark.)

### 1.    The Trademark Office Had Substantial Evidence that the Numerical Terms Were Not Distinctive

The Trademark Office appeared to understand that the numerical terms in DRL's

applications were widely used in the industry and that DRL could not claim rights based on the

prior use and registration of "1.0 POINT" stylized, "1.25 POINT" stylized, and "1.5 POINT"

stylized. For example, in the Office Action of July 12, 2002, in Application Serial No.

76/296,931 ("1.25" for cigarettes), the Examining Attorney made the following statement based

on the evidence attached to the Office Action:

> The examining attorney attaches evidence collected from the
> internet consisting of advertisements and information about a wide
> array of cigarette rolling paper products. This evidence indicates
> that the terms '11/4', '11/2','1.5','1.0' and '1' are used by
> cigarette rolling paper manufacturers to indicate a particular size of
> their rolling paper products.
>
> For instance the Zig-Zag ® brand rolling papers are described in
> 11/4 and 1/1/2 widths. The Abadie ®, Bambu ®, Chills ®, Joker
> ®, Bugler ®, Club®, Cord ®, Rizla ®, and e-z wider ® brands all
> appear to utilize these numerals in a way to indicate the size of the
> rolling paper to the consumer. In particular, the ALIEN ® brand
> uses the numeral 1.5 on their packaging similar to the applicant's
> proposed '1.25'. Finally, in connection with the Job ® brand
> rolling papers, the evidence indicates that the applicant's
> previously registered marks 1.0, 1.25 and 1.5 are used in
> connection with this brand in a way that 'describes' a characteristic
> of the goods, presumably the width of the papers.

The Examining Attorney was also aware that DRL had itself acknowledged that the

numerical terms were merely descriptive, stating that "[t]he applicant owns U.S. Registration

Nos. 1,481,006 for 1.0 POINT with 1.0 disclaimed; U.S. Registration No. 1,328,866 for 1.25

POINT under Section 2(f); and U.S. Registration No. 1,331,207 for 1.5 POINT also under

Section 2(f), all for cigarette rolling papers. It should be noted again that these Registrations,

13

with the numerals either disclaimed, or registered under section 2(f) for acquired distinctiveness, indicate that the marks **are not inherently distinctive, and that the numerals therein, namely 1.0, 1.25 and 1.5, are descriptive of the characteristics of the goods.**" (emphasis added).

2.    **RBA's Expert Survey Proves that the Plain Numeric Designations Are Understood by Purchasers and Prospective Purchasers as Being Descriptive of Cigarette Papers or As Indicating the Category of Cigarette Papers**

RBA's survey expert, John A. Bunge, conducted a double-blind survey of 319 participants to determine whether the opposed designations, as used in connection with cigarette rolling papers, are perceived by the relevant consuming public as "brand names," "categories of goods," or "descriptive of goods." A copy of Mr. Bunge's report is attached as Ex. 9.

Mr. Bunge's survey showed that 86% of those surveyed perceived "1.0", "1.25", and "1.5" as descriptive or as categories as used in connection with cigarette papers. That is, 60.5% of those surveyed believe that the numeric terms are "descriptive of certain kinds or types of products in a category," and that 25.4% of respondents believe that the terms are "categories of something that refer to all products within that category." Though DRL has used its "1.0 POINT" stylized, "1.25 POINT" stylized, and "1.5 POINT" stylized marks for decades and though a third of the survey was conducted in DRL's home city of Chicago, only 11.3% of those surveyed thought that the opposed numerals were brands that referred to specific products in a category that came from a single company.

In determining whether a prospective mark is generic or descriptive, the Board is to view the term from the standpoint of the average prospective purchaser. To determine the viewpoint of the prospective purchasers in an Opposition proceeding, "substantial weight may be accorded the result of a properly conducted survey." *Anhesuer-Busch, Inc. v. The Stroh Brewery Co.*, 224 USPQ 657 (8th Cir. 1984); *McDonough Power Equipment, Inc. v. Weed Eater, Inc.*, 208 USPQ 676 (TTAB 1981)(surveys are admissible before TTAB); *J & J Snack Foods v. McDonald's*

14

*Corp.*, 18 USPQ2d 1889 (Fed. Cir. 1991)(Federal Circuit Court of Appeals found consumer survey "admissible and given appropriate weight" to support Board's findings in opposition proceeding).

The Bunge survey was conducted by a qualified survey expert with over thirty years of experience in the field, was directed to the marks at issue, and was directed to a relevant portion of potential consumers. The questions of the Bunge survey were clear and not misleading or biased, and the accreditation and validation of responses were handled in a scientific manner, rendering the survey results relevant and reliable. The results of the survey clearly follow from the overwhelming evidence of functionally descriptive use by DRL itself, RBA, and many others in the industry.

### 3. DRL Cannot Claim Acquired Distinctiveness Based on the Use and Registration of Materially Different Marks

As is evident from the application files, DRL based its applications under Section 2(f) for registration of "1.25" and "1.5" for "cigarette papers" on the use and registration of "1.25 POINT" stylized and "1.5 POINT" stylized for cigarette papers, and it based its claims of acquired distinctiveness for the admittedly descriptive "1.0", "1.25", "1.5" and "2.0" for "cigarettes" on the argument that each was the "legal equivalent" of the registered and used "1.0 POINT" stylized, "1.25 POINT" stylized, and "1.5 POINT" stylized marks for "cigarette papers".

The registered marks are materially different from the plain numerals in the applications, which, as shown by the expert survey, are overwhelmingly recognized as being descriptive of cigarette papers or as indicating categories of cigarette papers. The registration of "1.0 POINT" stylized was registered with a disclaimer of "1.0", and "1.25 POINT" stylized and "1.5 POINT" stylized were registered under Section 2(f). The only distinctiveness in the registered marks was

15

in the stylization of the numerals and the use of the word "POINT". There is a significant difference between recognition of a highly stylized numeral containing the word mark "POINT" and the recognition of a plain typed numeral. In fact, the use of the word "POINT" and the stylization were considered sufficient in themselves to justify registration of "1.0 POINT" (Stylized), with a disclaimer of the plain numeral "1.0" (Reg. No. 1,481,006).

The only actual evidence of use in the opposed application files relates to the use of the materially different "1.0 POINT" stylized, "1.25 POINT" stylized, and "1.5 POINT" stylized designations for cigarette papers. There is no evidence of use of the plain numerals anywhere in the files. Even if it were to be accepted that these registered marks had become distinctive of DRL's products, they are fundamentally distinct from the plain numerals "1.0", "1.25", "1.5" and "2.0". DRL's existing use and registrations under section 2(f) cannot be used to obtain registrations of materially different numerals in block form. *In re Best Software Inc.*, 63 USPQ2d 1109, 1113 (TTAB 2002); *see also In re Save Venice New York, Inc.*, 59 USPQ2d 1778, 1782, 259 F.3d 1346 (Fed. Cir. 2001).

### 4.    DRL Itself Uses Numerals to Indicate the Size of Cigarette Papers

The functional importance of size in the industry is reflected in DRL's own product advertisements, testimony, and discovery responses. DRL's own advertisements consistently tout the functional size qualities of its products as reflected in the numeric designations they bear. One advertisement states, **"Pick a Pack! J◊B has your size,"** and **"Be sure you're stocked with all four J◊B cigarette paper sizes."** Ex. 2.[2] Applicant advertises its 1.25 size cigarette paper products as **"slightly larger than the average single-width"** paper, as follows:

---

[2] This document was submitted with Response to Office Action, Ex. C, dated 10/24/1983, for App. Ser. No. 73/358,902 for 1.25 POINT (Stylized).

16

> Try the best, try JOB 1.25 ™ Cigarette Paper, America's favorite
> fine, white paper **specifically sized for perfect rolling** by
> experienced smokers.  This delicately watermarked and gummed
> paper **is cut slightly larger than the average single-width paper**
> for maximum ease of rolling.

Ex. 2 (emphasis added).[3]

DRL itself treats its 1.5 size cigarette paper as the equivalent of a 1 ½ size paper in its

advertising, referring to its JOB 1.5 rolling paper as a "1 ½ style paper for easy rolling," and

referring to its JOB 1.0 as a "Single Width" paper.  DRL0064, DRL0065, Ex. 2.  Applicant's use

of 1.25 and 1.5 in its own advertisements to indicate the relative sizes of its cigarette rolling

papers is strong evidence that the numeric designations 1.25 and 1.5 cannot function as

trademarks when used in connection with rolling papers.

DRL also admits that the numerals refer to size in its deposition testimony.  DRL

admitted, for example, that the cigarette papers sold by DRL bearing the term 1.5 were smaller

than the papers described as "double wide," and larger than the "traditional single width" papers.

Levin Dep., pp. 54-55, Ex. 3.  Similarly, the cigarette papers sold by DRL under the term 1.25

were smaller than the cigarette papers sold bearing the term 1.5.  Levin Dep., pp. 55-56, Ex. 3.

DRL has also otherwise admitted that these numerical terms (1.0, 1.25, 1.5) indicate size, stating

that the numerals represented size ranges in a product line.  Levin Dep., pp. 56-57, Ex. 3 DRL

recognizes that the numeric designations indicate size to consumers, regardless of whether they

appear in decimal or fractional form Levin Dep., p. 90 and pp. 119-120.

DRL acknowledges that, "In our line there is a correspondence between the ascendancy

of the numbers and the area of the paper . . . ." and thus that the numerals that are the subject of

the applications are indicative of product size.  Gold Deposition, Vol. I, p. 42, Ex. 1.  These

---

[3] This document was submitted with Response to Office Action for App. Ser. No. 76/369,872, for 1.25, dated 12/18/2002, Ex. D.

17

admissions that the decimal numerals are indicative of size reinforce that, as shown by RBA's expert survey, the primary significance of the designations in the minds of the consuming public are related to the product, not the producer. *King-Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F. Supp. 1138, 1158-59 (S.D. Tex. 1982).

DRL also admits in its discovery responses that its 1.25 and 1.5 designations "suggest to consumers the approximate size range of Applicant's goods." Resp. to Req. 3 of Applicant's Responses to Opposer's First Set of Requests for Admission, p. 3, Ex. 4. Applicant further admits that it "may have mistakenly used the terms '1¼ size,' '1½ size" in promotional materials referring to Applicant's cigarette papers to consumers". Resp. to Req. 8 of Applicant's Responses to Opposer's First Set of Requests for Admission, p. 6, Ex. 4.

The foregoing passages illustrate that the numerals in fractional form are synonymous with those in decimal form, and even for DRL numeric designations are intended to convey information about product size to the consumers.

### 5.   RBA Also Uses Numerals to Indicate the Size of Cigarette Papers

RBA has used the numerals "1.0", "1¼" and "1 ½" for many years to indicate the size of its cigarette rolling papers, has used "2.0" to indicate the size of cigarette papers, and has long owned registrations of marks for cigarette papers with disclaimers of "1.0" and "2.0". Mancuso Decl. Ex. 6. RBA uses the designations 1.0, 1 ¼ , and 1½ on its packaging to indicate the sizes of its papers, and the exhibits show that RBA's cigarette rolling papers are referred to by sellers as being available in the 1.25 (or sometimes 1 ¼ ) and 1.5 (or sometimes 1 ½ ) sizes. Mancuso Dep. P. 148, Lines 13-22, P. 149, Lines 1-7, Ex. 5. Russell Mancuso, the General Manager of RBA, states that RBA, which has a sizable share of the market for rolling papers, has been using numeric designation for a number of years, and, on information and belief, RBA has been using numerical designations to indicate size since as early as 1985. Mancuso Decl., Ex. 5, ¶ 2, Ex. A.

18

RBA's cigarette papers bearing numeric designations for size are sold to consumers nationwide. Mancuso Decl., Ex. 6, ¶ 2.

Use and registration of identical and exactly equivalent numerical size designations by one of DRL's major competitors should alone be sufficient to prevent registration by DRL of the numerals "1.25" and "1.5" for "cigarette papers" and of "1.0", "1.25", "1.5", and "2.0" for cigarettes.

### 6.    Numerals Are Otherwise Commonly Used in the Industry Use to Indicate the Relative Sizes of Cigarette Papers

Such numeric designators 1.0, 1 ¼, 1.25, 1 ½, 1.5, 2, and 2.0 are also otherwise commonly used in the industry to describe the size categories of cigarette rolling papers. The ascending numbers in this sequence comport with the ascending sizes used by manufacturers, retailers, and purchasers to describe products in the industry. If "numerals indicate something besides origin, such as style, quality, size, or patterns, they do not constitute valid trademarks." *In re Union Oil Co. of Ca.*, 33 USPQ 43, 24 CCPA 987, 988 (CCPA 1937).

Attached hereto as Ex 7 is the declaration of Patricia Kirylo ("Kirylo Decl.") with attached print-outs from numerous commercial web sites found on the Internet which advertise and discuss cigarette rolling papers for sale. These print-outs show that such numerals as "1.0", "1.25", "1.5" and "2.0" are still commonly used to designate relative sizes for cigarette rolling papers and that 1 ¼ and 1 ½ are used interchangeably with 1.25 and 1.5 for the same purposes.

For example, one online retailer categorizes rolling papers for sale on its site using the designations "1 ½" and 1 ¼", but goes on to list the "19 most popular brands in the U.S." to include, among others, "ZIG ZAG ORANGE 1.25, ELEMENTS 1.25 EZ WIDER 1.25, JOKER 1.25, PRIZM 1.25, RAW 1.25, AND BOB MARLEY 1.25." Kirylo, Par. 8, Ex. E. Another common practice is for retailers to offer a "drop down menu" that allow buyers to search for and

19

choose rolling papers by width, including by categories "single, 1.25, 1.5 and double widths."
Kirylo Decl., Par. 11, Ex. H.

Retailers use the word "size" in connection with decimal designations to describe rolling papers as they do with fractions. Kirylo Decl.. Par. 18, Ex. O (online retailer offering for sale "1.25 SIZE" BOB MARLEY brand); Par. 20, Ex. Q (online retailer offering "small 1.25 size" SMOKING ORANGE papers, ELEMENTS brand "1.25 size" papers, and "raw natural unbleached rolling papers", "burn flavoured transparent", KLEAR brand all in "1.25 size"); Par. 23, Ex. T (online retailer offering JUICY JAYS brand papers in "1.25 size" in various flavors); Par. 11, Ex. H (online retailer selling BROWN SUGAR and SMOKING brands in "Size 1.25").

It is also commonplace for online retailers to use of 1 ¼ and 1 ½ to designate the size of cigarette papers of various brands, including RAW, JUICY JAY'S, BOB MARLEY, CHILLS, TRIBAL, GAMBLER, GI JAYS CAMAFLOUGE, 420, ABADIE, TRIP MINI SIZE, and SATIVO. Kirylo Decl., Par. 10, Ex. G; Par. 11, Ex. H; Par. 12, Ex. I, Par. 14, Ex. K; Par. 16, Ex. M; Par. 17, Ex. N; Par. 22, Ex. S. Retailers refer to the designations 1 ¼, 1 ½ and 2.0 as "widths" to describe the rolling papers they advertise. Kirylo Decl., Par. 15, Ex. L; Par. 26, Ex. W.

Many of the same online retailers use 1.25 and 1.5 interchangeably with their fractional equivalents 1 ¼ and 1 ½ to refer to "width sizes." Kirylo Decl., Par. 6, Ex. C; Par. 9, Ex. F; Par. 12, Ex. I (Describing rolling papers marked 1 ½ for sale as available in "1.25 and 1.5 width sizes."). One web site describes HEMPIRE brand rolling papers alternatively as available in "One-and-a-quarter" and "One-and-a-half widths", as "1 ¼ Wide" or "1.25 each" and "1 ½ Wide" or "1.25 [sic] each." Kirylo Decl., Par. 13, Ex. J.

Ebay sellers use decimal designations to sell cigarette papers to other consumers on the Internet. Kirylo Decl., Par. 24, Ex. U (Ebay seller refers to CAMAFLOUGE brand 1.5 tobacco rolling papers for sale; sellers of ZIG ZAG brand refer to "ZIG-ZAG LIGHTS 1.0"). Finally, unsolicited third-party media attention reinforces consumer perceptions that numeric designation describe rolling paper size. Kirylo Decl., Par. 5, Ex. B (*Roll Your Own* online magazine article referring to HEMPIRE brand "1.25 and 1.5 width sizes.").

There is extensive evidence available on the Internet that shows that the numeric designations are generally perceived as descriptive of relative sizes of cigarette papers and not as trademarks. This evidence includes definitions taken from Wikipedia, which describes TOP (rolling papers) as "available in two different sizes, including 1.25 and 1.5"." The definition of "Rolling papers" includes the following Wikipedia information, "Rolling papers are sold in lengths of 70mm – 110mm and a range of widths that can lead to a cigarette that contains 1 to 1.5 times the amount of tobacco as a Single wide paper." Kirylo Decl., Par. 7, Ex. D.

RBA testified that other manufacturers in the industry, for example, Miguel Y Costas, use the numeric designations, again to indicate relative sizes of rolling paper products that are distributed throughout the United States. Mancuso Decl., ¶ 5, Ex. D, Ex. 6; Mancuso Dep. P. 125, Lines 15-18; P. 126, Lines 3-15, Ex. 5. Mr. Mancuso testified that he himself has seen and purchased these third-party products in retail outlets as recently as August 2007. Mancuso Dep., P. 127, Lines 17-22; P. 128, Lines 1-8, Ex. 5. He has also declared based on first hand observations that retailers and wholesalers use the designations 1.25 and 1.5 and the fractional equivalents to indicate relative product sizes in connection with advertising third-party brands of rolling papers. The advertised brands of which Mr. Mancuso has first hand knowledge include

"ZIG-ZAG", "CHILL", "BAMBU", JAMAICAN HEMP", "SKUNK", and "ZEN" brands.

Mancuso Decl., Ex. 6.

> 7. **DRL's Efforts to Prevent Fair Use of the Numerical Designations Have Not Been Successful**

Third-party use of 1.0, 1.25, and 1.5 and their fractional or word equivalents as size

indicators for cigarette rolling papers is so widespread as to be ubiquitous. The widespread use

by third parties of the numeric designations is evidenced by the sheer volume of cease and desist

correspondence produced by DRL in this proceeding. A list of the recipients of cease and desist

letters produced by Applicant is compiled and attached hereto as Appendix C. DRL has made a

cottage industry of trying to intimidate competitors and retailers by threatening legal action

against fair use, including e.g. members of the convenience store industry.

Some recipients of the cease and desist letters have been sophisticated enough to

challenge the "rights" asserted by DRL but eventually backed down in the face of bullying

threats of litigation. *See* Letter dated February 17, 1997 from counsel for North Atlantic to Seth

Gold, Ex. 8 (DRL0362-DRL0363); and Letter dated February 24, 1997 from Eugene Flanagan,

counsel for North Atlantic Trading Company to Seth Gold agreeing to refrain from using 1.0,

1.25 and 1.5, "but without admission of Republic's charges of infringement, but solely to avoid

litigation." Ex. 8 (DRL0369). Other third-parties, including Chief Patent and Trademark

Counsel at tobacco company Brown & Williamson, resisted the unreasonable demands of DRL

in pointing out (correctly) that the numerals 1.0, 1.25 and 1.5 are "universally recognized as

[generic size designations] by the trade and the purchasing public." Letter dated August 5, 1992

from Charles Sherman to Donald Levin. Ex. 8 (DRL 06767).

DRL directed its attorney to "warn" advertisers on the Internet that they were violating

DRL's trademark rights by using 1.0, 1.25 and 1.5 to describe products for sale. *See* Email dated

July 27, 2007 from Lee James to Matt Hampton. Ex., 8 (DRL06765). Once again, the site

owner, presumably a non-lawyer, complied with DRL's baseless demands without question.

Ex. 8 (DRL 06764-06766). *See also* Letter dated May 7, 2999 from DRL to proprietor of

"Discount Cigarette" web site providing ten days to comply with demands before DRL

contacted, "such authorities as it deems necessary or desirable to protect its rights." Ex., 8

(DRL0354-DRL0356). Mr. Gold goes so far in his letters as to suggest that DRL is entitled to an

accounting for damages as a result of use of the 1.0, 1.25, and 1.5 designations in a third-party

product "Buying Guide." *See* September 7, 1999 letter from Seth Gold to Ed McVey of Santa

Clara, Inc. (DRL0358). An example of the kinds of threats made by DRL against fair use of the

numerals is found in a Letter dated September 8, 1987 from Don Levin to Mr. Michael Y.

Bollore, Bollore Technologies. Ex. 8 (DRL0314-DRL0315, DRL0318).

## IV.    CONCLUSION

Despite efforts over the course of many years, DRL has not been successful in preventing

the fair use of the numeric designations in connection with the sale of cigarette papers or to

change consumer perception of the numerals as descriptive of size. DRL nevertheless persists in

its efforts to remove the terms from the public domain for its exclusive benefit. The new

applications for registration of the plain numerals "1.25" and "1.5" for "cigarette papers" are in

furtherance of this effort, as are the applications for registration of "1.0", "1.25", "1.5", and "2.0"

for cigarettes, which will no doubt be used by DRL not only to establish a preemptive

stranglehold on the use of these functional terms for cigarettes but also in connection with

preventing "infringing" fair use for cigarette papers. However, there can be no genuine issue of

material fact as to whether these terms are inherently descriptive and have remained descriptive

and are unregistrable either because they are functionally significant and therefore incapable of

becoming trademarks or because they have not become distinctive as DRL's "marks" both because it has not used them as marks and because they are commonly used descriptively in the industry and understood by consumers as descriptive terms and not as trademarks.

Respectfully submitted,

MAY 1, 2008

Brewster Taylor
STITES & HARBISON PLLC
1199 North Fairfax Street
Suite 900
Alexandria, VA 22314

Amy S. Cahill
STITES & HARBISON PLLC
400 West Market Street, Suite 1800
Louisville, Kentucky 40202

Attorneys for Opposer

## CERTIFICATE OF SERVICE

I hereby certify that a true copies of the foregoing OPPOSER'S OPPOSITION TO APPLICANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSER'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT and exhibits were served on counsel for Applicant, this 1st day of May, 2008, by sending same via First Class Mail, postage prepaid, to: Antony J. McShane, Esq., Michael G. Kelber, Esq., and Lara Hirshfeld, Esq, Attorneys for Applicant, NEAL, GERBER & EISENBERG LLP, 2 N. LaSalle Street, Suite 2200, Chicago, Illinois 60602.

Brewster Taylor

## <u>LIST OF APPENDICES</u>

APPENDIX A        List of Exhibits

APPENDIX B        Graphical Representation of Stylized Marks

APPENDIX C        List of Recipients of Cease and Desist Correspondence

APPENDIX D        Exhibits 1-9

25

## APPENDIX A

## LIST OF EXHIBITS

**Exhibit No. 1.**    Deposition of Seth Gold Dated December 11, 2007

    a.     Gold Dep., p. 78, ln. 19–p. 79, ln. 21.

    b.     Gold Dep. p.79, lns. 17–18.

    c.     Gold Deposition, pp. 42.

**Exhibit No. 2.**    Applicant's Advertising of Job Brand Cigarette Papers

    a.     "Pick a Pack! JOB has your size," and "Be sure you're stocked with all four JOB cigarette paper sizes."[4]

    b.     "Try the best, try JOB 1.25 ™ Cigarette Paper, America's favorite fine, white paper specifically sized for perfect rolling . . ." (emphasis added).[5]

    c.     "1 ½ style paper for easy rolling" and refers to its JOB 1.0 as a "Single Width" paper.  (DRL0064, DRL0065).

**Exhibit No. 3.**    Deposition of Don Levin Dated December 12, 2007

    a.     Levin Dep., pp. 54-55.

    b.     Levin Dep., pp. 55-56.

    c.     Levin Dep., pp. 56-57 (emphasis added).

    d.     Levin Dep., p. 90.

**Exhibit No. 4.**    Applicant's Responses to Opposer's Requests for Admissions

    a.     Resp. to Req. 3 of Applicant's Responses to Opposer's First Set of Requests for Admission, p. 3.

    b.     Resp. to Req. 8 of Applicant's Responses to Opposer's First Set of Requests for Admission, p. 6.

**Exhibit No. 5.**    Deposition of Russell Mancuso Dated September 5, 2007.

---

[4] This document was submitted with Response to Office Action, Ex. C, dated 10/24/1983, for App. Ser. No. 73/358,902 for 1.25 POINT (Stylized))

[5] This document was submitted with Response to Office Action for App. Ser. No. 76/369,872, for 1.25, dated 12/18/2002, Ex. D,

a.    Mancuso Dep. p. 148, lns. 13-22, P. 149, Lines 1-7.

b.    Mancuso Dep. p. 125, lns. 15-18; P. 126, Lines 3-15.

c.    Mancuso Dep., p. 127, lns. 17-22; P. 128, Lines 1-8.

**Exhibit No. 6.**    Declaration of Russell Mancuso

**Exhibit No. 7.**    Declaration of Patricia Kirylo

**Exhibit No. 8.**    Selected Cease and Desist Correspondence from DRL

a.    See Appendix C

**Exhibit No. 9.**    Report of John A. Bunge

27

**United States Patent and Trademark Office**

Home|Site Index|Search|Guides|Contacts|eBusiness|eBiz alerts|News|Help



**TTABVUE. Trademark Trial and Appeal Board Inquiry System**                    **v1.4**

# Opposition

**Number:** 91158493                        **Filing Date:** 10/15/2003
**Status:** Pending                         **Status Date:** 11/11/2003
**Interlocutory Attorney:** CHERYL S GOODMAN

**Defendant**

**Name:** DRL Enterprises, Inc.
**Correspondence:** ANTONY J. MCSHANE
NEAL, GERBER & EISENBERG
TWO NORTH LASALLE STREET, SUITE 2300
CHICAGO, IL 60602-3801
lhirshfeld@ngelaw.com, mkelber@ngelaw.com, amcshane@ngelaw.com

**Serial #:** 76296926               Application File
**Application Status:** Opposition Pending
**Mark:** 2.0

**Serial #:** 76296942               Application File
**Application Status:** Opposition Pending
**Mark:** 1.0

**Serial #:** 76369872               Application File
**Application Status:** Opposition Pending
**Mark:** 1.25

**Serial #:** 76296931               Application File
**Application Status:** Fifth Extension - Granted
**Mark:** 1.25

**Serial #:** 78157851               Application File
**Application Status:** Opposition Pending
**Mark:** 1.5

**Serial #:** 76296945               Application File
**Application Status:** Opposition Pending
**Mark:** 1.5

**Plaintiff**

**Name:** Robert Burton Associates, Ltd
**Correspondence:** BREWSTER TAYLOR
STITES & HARBISON, PLLC
Transpotomac Plaza , 1199 North Fairfax St; Ste 900
Alexandria, VA 22314
btaylor@stites.com

**Granted To Date:** 10/15/2003

**Prosecution History**

| # | Date | History Text | Due Date |
|---|------|--------------|----------|
| 81 | 07/14/2008 | D'S REPLY IN SUPPORT OF MOTION | |
| 80 | 07/14/2008 | D'S REPLY IN SUPPORT OF MOTION | |

79 07/14/2008 D'S REPLY IN SUPPORT OF MOTION
78 06/25/2008 P'S REPLY IN SUPPORT OF MOTION
77 06/25/2008 P'S OPPOSITION/RESPONSE TO MOTION
76 06/23/2008 P'S OPPOSITION/RESPONSE TO MOTION
75 06/23/2008 P'S OPPOSITION/RESPONSE TO MOTION
74 06/16/2008 DEF'S BRIEF IN OPP. TO CROSS MOTION FOR SUMMARY JUDGEMENT
73 06/16/2008 PL'S TESTI. DEP WITH EXHIBITS
72 06/05/2008 DRL'S BRIEF IN OPP. TO OPPOSER CROSS-MOTION FOR SUMMARY
          JUDGEMENT
71 06/05/2008 D'S MOTION TO STRIKE
70 06/05/2008 D'S MOTION TO STRIKE
69 06/05/2008 D'S MOTION TO STRIKE
68 06/03/2008 PAPER RECEIVED AT TTAB
67 06/02/2008 PAPER RECEIVED AT TTAB
66 05/27/2008 PAPER RECEIVED AT TTAB
65 05/21/2008 D'S REPLY IN SUPPORT OF MOTION
64 05/07/2008 PART 2 EXHIBITS FOR P'S OPPOSITION TO MOTION FOR PARTIAL
          SUMMARY JUDGMENT
63 05/07/2008 PART 1 EXHIBITS FOR P'S OPPOSITION TO MOTION FOR PARTIAL
          SUMMARY JUDGMENT
62 05/06/2008 P'S OPPOSITION/RESPONSE TO MOTION
61 05/01/2008 P'S OPPOSITION/RESPONSE TO MOTION
60 05/01/2008 P'S OPPOSITION/RESPONSE TO MOTION
59 05/01/2008 P'S OPPOSITION/RESPONSE TO MOTION
58 04/28/2008 DEF'S REQUEST FOR RECONSIDERATION
57 04/28/2008 DEF'S REQUEST FOR RECONSIDERATION
56 04/22/2008 SUSPENDED
55 03/27/2008 CONFIDENTIAL - DEF'S BRIEF IN SUPPORT OF PARTIAL S.J.
54 03/27/2008 CONFIDENTIAL - DEF'S MOT AND MEMO TO AMEND
53 03/27/2008 CONFIDENTIAL - DEF'S DECL. OF LARA V. HIRSHFELD
52 03/27/2008 CONFIDENTIAL - DEF'S DECL. OF LARA V. HIRSHFELD
51 03/27/2008 REDACTED DECL. OF LARA HIRSHFELD
50 03/27/2008 D'S BRIEF IN SUPPORT OF PARTIAL SUMMARY JUDGMENT
49 03/27/2008 D'S MOTION FOR SUMMARY JUDGMENT
48 03/27/2008 D'S REDACTED DECLARATION FOR MOTION TO AMEND
47 03/27/2008 MOTION TO AMEND ANSWER/AMENDED ANSWER OR COUNTERCLAIM
46 03/26/2008 TRIAL DATES RESET
45 12/10/2007 TEL CONF. INTERIM RULING MOTION TO COMPEL
44 10/19/2007 CONFIDENTIAL - DECL. OF ANTONY J. MCSHANE
43 11/20/2007 D'S REPLY IN SUPPORT OF MOTION
42 11/15/2007 SUSPENDED
41 11/06/2007 P'S OPPOSITION/RESPONSE TO MOTION
40 11/06/2007 Confidential Plaintiff's Opposition/Response to Motion
39 10/19/2007 D'S MOTION TO COMPEL
38 10/24/2007 EXTENSION GRANTED; DEPOS RESCHEDULED; PO MOOT
37 10/19/2007 D'S OPPOSITION/RESPONSE TO MOTION

36 08/03/2007 P'S MOT FOR EXTEN. OF TIME W/ CONSENT
35 07/18/2007 PLAINTIFF'S NOTICE OF TAKING TESTIMONY
34 07/12/2007 PLAINTIFF'S NOTICE OF TAKING TESTIMONY
33 06/06/2007 TRIAL DATES RESET
32 05/23/2007 STIPULATION FOR AN EXTENSION OF TIME
31 05/07/2007 PROCS RESUMED; TRIAL DATES RESET
30 10/27/2006 P'S MOTION TO RESUME PROCEEDINGS
29 03/24/2006 SUSPENDED
28 03/02/2006 P'S MOT TO SUSP PEND SETLMT NEGOTIATIONS
27 02/28/2006 EXTENSION OF TIME GRANTED
26 01/23/2006 D'S MOT FOR EXTEN. OF TIME W/ CONSENT
25 10/26/2005 TRIAL DATES RESET
24 10/21/2005 ANSWER
23 10/21/2005 P'S MOTION FOR DEFAULT JUDGEMENT
22 07/22/2005 PLN'S RECONS IS DENIED AND DISC AND TRIAL DATES ARE RESET
21 05/12/2005 PL'S REPLY REQUEST FOR RECON OF SJ
20 04/25/2005 DEF'S RESPONSE TO PL'S REQUEST FOR RECON
19 04/04/2005 P'S MOT FOR RECONS. OF THE DENIAL CROSS MOT FOR S.J.
18 03/30/2005 UNDELIVERALBE MAIL
17 03/03/2005 MOTION FOR SUMMARY JUDGMENT DENIED
16 12/20/2004 PLS RESPONSE TO DEF'S MOT TO STRIKE
15 11/29/2004 DEF MOTION TO STRIKE DECLARATION
14 11/17/2004 DEF REPLY IN SUPPORT MOT FOR PROTECTIVE ORDER
13 11/08/2004 PLN BRIEF IN OPP TO DEF MOT FOR PROTECTIVE ORDER
12 11/08/2004 PLN BRIEF IN REPLY TO DEF BRIEF FOR S/J
11 10/19/2004 DEF MOTION FOR PROTECTIVE ORDER
10 10/19/2004 DEF MOTION FOR PROTECTIVE ORDER
9  09/29/2004 PLN BRIEF IN OPP TO DEF MOTION
8  08/30/2004 PROCS SUSP; PL'S RESPONSE DUE 9-29-04
7  01/22/2004 Procs Suspended Pending Mot to Dismiss; Bd's Ltr Re: Institution of
              Multiple Opps
6  12/22/2003 D's Reply in Support of its Motion to Dismiss
5  11/14/2003 D's Motion to Dismiss
4  12/02/2003 PLN BRIEF IN OPP TO DEF MOT TO DISMISS
3  11/19/2003 PENDING, INSTITUTED
2  11/19/2003 NOTICE AND TRIAL DATES SENT; ANSWER DUE:                    12/29/2003
1  10/15/2003 FILED AND FEE

Results as of 07/29/2008 02:45 PM  **Back to search results**          Search:



GRIPPO & ELDEN LLC

111 South Wacker Drive
Chicago, Illinois 60606
(312) 704-7700
FAX:     (312) 558-1195
          (312) 263-7356

To Call Writer Direct
(312) 704-7780
cbergen@grippoelden.com

July 31, 2008

Jon W. Dudas
Director of the U.S. Patent
  and Trademark Office
401 Dulany Street
Randolph Building
Alexandria, Virginia 22314

| | |
|---|---|
| TTAB Proceeding: | *Robert Burton Associates Ltd. v. DRL Enterprises, Inc.*, Opposition No. 91158493 |
| Civil Action: | *Republic Tobacco, L.P. v. Commonwealth Brands, Inc.*, Case No. 08-CV-3267 (N.D. Ill.) |
| Re: | Notice of a related civil action under 37 C.F.R. § 2.117. |

Dear Director Dudas:

We represent Republic Tobacco L.P. ("Republic"), an affiliate and licensee of DRL Enterprises, Inc. ("Applicant-DRL"), in a civil action recently filed in the United States District Court for the Northern District of Illinois, *Republic Tobacco L.P. v. Commonwealth Brands, Inc.*, Case No. 08-CV-3267 (N.D. Ill.) (the "Civil Action"). The Civil Action seems likely to have a bearing on the above-referenced TTAB Proceeding between Applicant-DRL and Robert Burton Associates Ltd. ("Opposer-RBA"), and, pursuant to 37 C.F.R. § 2.117, the current TTAB Proceeding may appropriately be suspended pending the outcome of the Civil Action. Attached for your convenience are copies of the Complaint and Answer from the Civil Action.

Republic and Applicant-DRL share common management and Republic is the exclusive licensee and distributor of the marks "1.25" and "1.5" for use with cigarette rolling papers. The named defendant in the Civil Action, Commonwealth Brands, Inc. ("CBI"), is an affiliate and the successor to Opposer-RBA. In 2007, Opposer-RBA was merged into CBI. CBI is the successor to Opposer-RBA in the distribution of two competitive lines of cigarette papers, "Joker" and "E-Z Wider."

The issues to be decided in the Civil Action are likely to have a bearing on the TTAB Proceeding. *See* 37 C.F.R. § 2.117. In the Civil Action, Republic asserts that CBI and



Assistant Commissioner of
Trademarks
July 31, 2008
Page 2

RBA's use of the marks "1.25" and "1.5" in connection with cigarette rolling papers violates the terms of a written contract between the parties' predecessors entered in 1979 and reaffirmed in 2001. Republic further asserts that CBI and RBA's use of the "1.25" and "1.5" marks in connection with cigarette papers constitutes trademark infringement in violation of the Lanham Act. In addition, a counterclaim was also filed in the Civil Action that seeks, among other things, a declaration that the marks "1.25" and "1.5" are not protectable under the trademark laws.

In order to resolve the entire controversy in one forum, it may be appropriate under § 2.117 to suspend that TTAB Proceeding pending resolution of the Civil Action.

Very truly yours,

Charles S. Bergen

CSB:clr
Enclosures

cc:   Cheryl S. Goodman (Interlocutory Attorney) (w/enc.)
      Antony J. McShane (Neal, Gerber & Eisenberg)
      Brewster B. Taylor (Stites & Harbison PLLC)
      Emily H. Smith (Stites & Harbison PLLC)
      Donald R. Levin (DRL Enterprises, Inc. and Republic Tobacco, L.P.)

536536.2