**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| REPUBLIC TOBACCO, L.P., an Illinois Limited Partnership, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 08 C 3267 |
| COMMONWEALTH BRANDS, INC., a Kentucky Corporation, | ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Republic Tobacco, L.P. ("Republic" or "Republic Tobacco") sells tobacco-related products, including roll-your-own cigarette papers. The cigarette paper comes in various sizes, and Republic uses the designations "1.25" and "1.5" on two different products. In 1977, Republic's predecessor, Adams Apple Distributing Co., brought a suit against the predecessor-in-interest to Defendant Commonwealth Brands, Inc. ("CBI"). The 1977 lawsuit alleged, among other things, false designation of origin and false description and sought to enjoin Defendant's use of the fractional designations "1 ¼" and "1 ½" on cigarette paper produced by Defendant. The parties entered into a Settlement Agreement in 1979 ("Settlement Agreement" or "Agreement"), which allowed Defendant limited use of the fractional designations and, according to Plaintiff, prohibited Defendant from using decimal designations in its cigarette paper products. In 2008, CBI circulated an advertisement at a trade show that used decimal designations, and Republic brought this action. Republic now moves for summary judgment on its claim that CBI breached the Settlement Agreement. CBI has filed a cross-motion for summary judgment on the same claim. For the reasons given below, Plaintiff's motion is granted and Defendant's is denied.

# FACTUAL BACKGROUND

Republic distributes cigarette papers under the brand name "JOB,"[1] and sells, among other products, JOB 1.25 and JOB 1.5 cigarette papers. (Pl.'s 56.1 ¶ 3.) According to the Chairman of Republic Tobacco, JOB 1.25 and JOB 1.5 are two of the five best-selling tobacco paper brands in the United States. (Levin Decl. ¶ 11, Ex. A to Pl.'s 56.1.) Until 2007, Defendant's predecessor, Robert Burton Associates, Ltd. ("RBA"), distributed cigarette papers under the brand names "JOKER" and "E-Z WIDER." (Pl.'s 56.1 ¶ 5-7.) Imperial Tobacco plc, a United Kingdom limited company, bought RBA in 1997 and CBI in 2007. (*Id.* ¶¶ 6-7.) Later in 2007, RBA was merged into CBI, which began distributing the JOKER and EZ-WIDER brands. (*Id.* ¶¶ 7-8.) CBI does not contest that it is the successor-in-interest to RBA as the importer and distributor of JOKER and EZ-WIDER papers in the United States. (Def.'s Resp. ¶ 10.)

In 1977, Republic's predecessor brought suit against RBA, seeking, among other things, a determination of the parties' rights to use the fractional designations "1 ½" and "1 ¼" on packaging and other materials related to the sale of cigarette papers. (Pl.'s 56.1 ¶¶ 2, 11.) The litigation terminated when the parties entered into the 1979 Settlement Agreement. (*Id.* ¶ 12.) The Agreement allowed RBA to use the fractional designations provided that they were placed in "reasonable proximity" to the RBA brand name. (Settlement Agreement ¶¶ 1-2, Ex. C to Pl.'s 56.1.) The Agreement also provided that, "subject to" the provisions of the Agreement discussing permissible fractional use, RBA would not make "any proprietary use" of the decimal designations "on any packaging, advertising, or promotional materials." (*Id.* ¶ 3.) RBA also agreed not to oppose

---

[1] According to Wikipedia, the JOB brand was originally designed in 1838 in Perpignan, France by Jean Bardou. Bardou placed his initials on the booklet of rolling papers he made out of rice paper, with a diamond in between the "J" and the "B." People soon began referring to the papers as JOB. *See* JOB (rolling papers), http://en.wikipedia.org/wiki/JOB_rolling _papers) (last visited March 2, 2009).

Plaintiff's then-pending trademark registration applications for the decimal designations. (*Id.* ¶ 4.)

Paragraph 5 of the Agreement stated that nothing in the Agreement itself

> shall be construed to be or operate in derogation of or prejudicial to [sic] any rights, licenses or privileges which [RBA] may now or at any time hereafter enjoy as a member of the public, and [RBA] shall notwithstanding anything contained [above] to the contrary, have the right to exercise any rights, licenses or privileges as a member of the public as fully as though this agreement were not in existence.

(*Id.* ¶ 5.) Paragraph 5 went on to state, "without limitation upon the generality" of the above quoted provision, that the limitations regarding RBA's use of either the fractional or decimal designations would be lifted if a third party began using those designations and Adams Apple were unable to prevent the unauthorized use. (*Id.*)

In 1985, Republic's 1.5 and 1.25 marks, written in a distinctive style with the word "POINT" written on the decimal, were registered as trademarks with the U.S. Patent and Trademark Office. (Ex. 2 & 3 to Def.'s 56.1.) Although the parties provide few details, it appears that in 2001, DRL Enterprises, an affiliate of Republic, sought registration for the non-stylized marks of "1.25" and "1.5" for cigarette rolling papers. (Ex. S to Pl.'s 56.1, at 1.) RBA opposed the registration in 2003, and the pending proceedings before the Trademark Trial and Appeal Board ("TTAB") were suspended pending resolution of Republic's case in this court.[2] (Ex. U to Pl.'s 56.1.)

At the National Association of Tobacco Outlets trade show in April 2008, CBI circulated a sales order form for its JOKER papers. (Pl.'s 56.1 ¶ 34.) "JOKER PAPERS" was written in large font at the top of the page. (Ex. M to Pl.'s 56.1.) Underneath pricing information and adjacent to a picture of the JOKER display, the form stated:

---

[2]     The parties have not explained why this litigation has continued for so long (over five years) without a final determination by the TTAB. Some of the length is likely due to motions filed by the parties, as DRL has filed a motion to dismiss and RBA has moved for summary judgment; both motions were dismissed. (Exs. S & T, Pl.'s 56.1.)

<u>Display Contains</u>

48 ea Regular Orange

24 ea Single Wide Double

24 ea 1.25

48 ea 1.50

(*Id.*) Weeks after the trade show, Republic brought this suit, alleging that CBI's use of "1.25" and "1.50" in its sales form breached the 1979 Settlement Agreement, among other claims. Plaintiff now seeks summary judgment only on the breach of contract claim, and Defendant has filed a cross-motion for summary judgment on the same claim.

## DISCUSSION

When considering cross-motions for summary judgment, the court draws reasonable inferences "in favor of the party against whom the motion under consideration was made." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 500 (7th Cir. 2008). Summary judgment will then be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Here, the parties agree on the relevant facts; their disagreement is confined to the meaning of the contract, a question of law. *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006) ("[A] contract's meaning is a matter of law, and where there is no contractual ambiguity, there is no resort to extrinsic evidence, hence no factual dispute to preclude summary judgment." (citation omitted)).[3] Accordingly, the court only needs to decide "whether either party 'is entitled to judgment as a matter of law.'" *Auto. Mechs. Local 701 Welfare*

---

[3] Republic has submitted documents from correspondence between itself and RBA in 2001 which reflect that RBA allegedly used, and agreed to stop using, the decimal designations. Because the court considers the language of the contract to be unambiguous, the court declines to consider this extrinsic evidence. *Lee v. Allstate Life Ins. Co.*, 361 Ill. App. 3d 970, 979, 838 N.E.2d 15, 24 (2d Dist. 2005) ("extrinsic evidence is admissible to explain the meaning of words in a contract only when there is an ambiguity").

& Pension Funds v. Vanguard Car Rental USA, Inc., 502 F.3d 740, 748 (7th Cir. 2007) (quoting FED. R. CIV. P. 56(c)). The parties do not dispute that Illinois law governs the interpretation of the contract, and the court agrees. See Pasant v. Jackson Nat'l Life Ins. Co. of Am., 751 F. Supp. 762, 764 (N.D. Ill. 1990) (under Illinois's "most significant contacts" test, interpretation of a settlement agreement was governed by the law of the state where the prior lawsuit was conducted and where one of the parties was domiciled).

As a preliminary matter, the court addresses an issue that, remarkably, appears to have escaped the parties' notice. The JOKER advertisement form at issue here referred to the sizes "1.25" and "1.50." (Ex. M to Pl.'s 56.1.) The Settlement Agreement, however, makes no reference to the designation "1.50." As set forth in Paragraph 3, the Agreement applies to a number of designations: "'ONE POINT FIVE', '1 POINT 5', 'ONE POINT TWO FIVE', '1 POINT 25', 'ONE POINT FIVE size', '1 POINT 5 size', 'ONE POINT TWO FIVE size', '1 POINT 25 size['] '1.5', '1.25', '1.5 size' or '1.25 size'." (Settlement Agreement ¶ 3, Ex. C to Pl.'s 56.1.) The list in Paragraph 3 is exclusive; it contains no suggestion that the cited designations are merely examples of the type of designations that are prohibited. The size "1.50" does not appear on that list or anywhere else in the Agreement. While the mathematical equivalence of "1.50" and "1.5" is apparent, the issue is the appearance; indeed, if mere mathematical equivalence rather than appearance were all that mattered, the list provided in Paragraph 3 of the Agreement could have been substantially shorter. CBI's use of "1.50" does not violate the Settlement Agreement, and the proceeding discussion will therefore focus solely on whether CBI's use of "1.25" constitutes a breach.

For purposes of this motion, the central paragraph of the Agreement is Paragraph 3, which provides: "Subject to the provisions of Paragraphs 1 and 2 above, [Defendant] agrees that it will not make any proprietary use of the designation[] . . . '1.25' . . . on any packaging, advertising or promotional materials for its cigarette rolling papers." (Settlement Agreement ¶ 3, Ex. C to Pl.'s 56.1.) Although CBI considers its use of the numbers to be rather minor and insignificant, it does

not seriously dispute that the materials it printed and distributed at the trade show contained the "1.25" mark and that these materials constituted promotional materials. CBI nevertheless maintains that Paragraph 3 does not bar its actions because, first, Paragraph 3 is made "subject to" Paragraphs 1 and 2, which would permit CBI's use; and second, CBI's use of the mark was a non-proprietary use that was not covered by Paragraph 3 and was explicitly permitted by Paragraph 5 of the Agreement.  As explained below, both arguments fail.

**I.       Paragraph 3**

Turning first to the argument concerning the plain language of Paragraph 3, CBI places great emphasis on the "subject to" clause of Paragraph 3.  Like Paragraph 3, which prohibits use of decimals in referring to "1.5" and "1.25," Paragraphs 1 and 2 prohibit the use of the terms "1-½ Size" and "1-¼ Size."  Unlike Paragraph 3, however, Paragraphs 1 and 2 explicitly carve out two exceptions to the prohibition.  First, Paragraphs 1 and 2 permit Defendant to sell off any unused inventory remaining in 1979 that had "1-½ Size" or "1-¼ Size" marks.  Second, the parties agreed that Defendant could continue to use the "1-½ Size" and "1-¼ Size" marks provided that those terms were located "in reasonable proximity" to a separate brand name, such as "E-Z WIDER" or "JOKER."  Paragraph 3, aimed at the use of decimals, is substantially shorter than Paragraphs 1 and 2 and contains neither of the carve-outs contained in the first two Paragraphs.  CBI argues that the carve-outs nevertheless apply to Paragraph 3 because Paragraph 3 is made "subject to the provisions of Paragraphs 1 and 2."  If these exceptions applied to Paragraph 3, CBI further asserts that its promotional materials would be authorized because the JOKER brand name at the top of the order form is in "reasonable proximity" to the "1.25" mark.

This argument is unpersuasive.  First, the plain language of the "subject to" clause does not support CBI's reading.  The clause at issue does not say that Paragraph 3 is subject to the *exceptions* listed in Paragraphs 1 and 2.  Instead, it says that Paragraph 3 is subject to the *provisions* of Paragraphs 1 and 2.  This language more naturally suggests that Paragraph 3 is not

meant to alter anything that was explicitly spelled out in the two preceding paragraphs. If CBI is correct that the same exceptions that apply to the terms in Paragraphs 1 and 2 also apply to the terms of Paragraph 3, one would have expected Paragraph 2 also to contain only the phrase "subject to the provisions of Paragraph 1." Instead, Paragraph 2 carves out the exact same exceptions as Paragraph 1 does, and uses identical language to do so. That language is entirely absent from Paragraph 3. Indeed, while Paragraphs 1 and 2 are each more than half a page long and explicitly spell out exceptions, Paragraph 3 is significantly shorter and makes no mention of *any* exceptions. CBI suggests that the reason for the difference is that CBI had previously manufactured "1-½ Size" and "1-¼ Size" products, but had not manufactured any products that used decimals and there was thus no need to include the provision allowing CBI to sell off its current inventory of noncompliant goods. This argument does not support its own logic, however, as it would require reading the "subject to" clause as importing one of the two exceptions from Paragraphs 1 and 2, but not the other exception and not the substantive prohibition. Nothing in the "subject to" language supports this reading.

Finally, the court notes that Paragraph 5 supports the conclusion that Paragraph 3 is intended differently than Paragraphs 1 and 2. Paragraph 5 provides that the limitations in Paragraphs 1 and 2 of the Agreement are lifted if Republic is unsuccessful at preventing a third party from using "1-½" or "1-¼" marks "without a separate brand name, trademark or logo being in reasonable proximity thereto."[4] (*Id.* ¶ 5(i), (ii).) Regarding Paragraph 3, however, Paragraph 5

---

[4]     Paragraph 5(i) states:
the limitations imposed upon Robert Burton in Paragraph 1 above shall cease to apply at such time as any third party shall market cigarette rolling papers in packages or with advertising or promotional material in which the term "1-½" or "1-½ Size" shall appear without a separate brand name, trademark or logo being in reasonable proximity thereto; provided that Robert Burton shall first have given notice to Adams Apple thereof and provided, further, that if
(a) such use shall have permanently ceased within 90 days after such notice from Robert Burton as the result of a demand upon such third party by
(continued...)

states that CBI may disregard the limitations of Paragraph 3 only if Republic cannot successfully

enjoin a third party from marketing cigarette papers "with advertising or promotional material or

packaging in which such [decimal] designation appears *in any way whatsoever.*"[5]   (*Id.* ¶ 5(iii)

(emphasis added).)  Again, unlike the references to Paragraphs 1 and 2, the reference made in

Paragraph 5 to Paragraph 3 does not contain any words that suggest the "reasonable proximity"

requirement applies to Paragraph 3.  Indeed, the fact that the references to Paragraphs 1 and 2 are

worded identically, and that they are worded differently than the reference to Paragraph 3, further

indicates that Paragraph 3 is meant to be interpreted differently.  The differences in the language,

the structure, and the length of Paragraph 3 compared to Paragraphs 1 and 2 satisfy the court that

Paragraph 3 has a different meaning and that the exceptions spelled out in the prior two paragraphs

do not apply to use of the "1.25" mark.

---

[4](...continued)
>
> Adams Apple to permanently cease such use, or
> (b) within 90 days after such notice from Robert Burton, Adams Apple shall commence legal proceedings to enjoin such use, and shall thereafter diligently prosecute such legal proceedings until a permanent injunction is issued with respect thereto, then and in such event, such limitations shall continue to apply.

Paragraph 5(ii) reads the same, with the necessary substitutions to make it apply to Paragraph 2.

[5]      In full, Paragraph 5(iii) provides:
> the limitations contained in Paragraph 3 above shall cease to apply with respect to any designation referred to in such paragraph at such time as any third party (other than a third party licensed by Adams Apple under a bona fide arm's length licensing agreement with respect to such designation) shall market cigarette rolling papers with advertising or promotional material or packaging in which such designation appears in any way whatsoever; provided that Robert Burton shall first have given notice to Adams Apple thereof and provided further that if
>> (a) such use shall have permanently ceased within 90 days after such notice from Robert Burton as the result of a demand upon such third party by Adams Apple to permanently cease such use, or
>> (b) within 90 days after such notice from Robert Burton, Adams Apple shall commence legal proceedings to enjoin such use and shall diligently prosecute such legal proceedings until a permanent injunction is issued with respect thereto, then such limitation shall continue to apply with respect to such designation.

## II.    Paragraph 5

CBI next argues that Paragraph 5 of the Agreement permits CBI's use of "1.25." Paragraph 5 states that Paragraphs 1 through 4 should not be construed so as to limit CBI's "right to exercise any rights, licenses or privileges as a member of the public as fully as though this agreement were not in existence." (*Id.* ¶ 5.) According to CBI, this paragraph gives it the right to make non-proprietary use, such as through fair use, of the designations otherwise prohibited in the Agreement, and that the use of "1.25" in the JOKER sales form was such a non-proprietary use. The first of these assertions, that the Agreement does not limit CBI's non-proprietary use of the decimal designations, is unproblematic and is reinforced by Paragraph 3, which prohibits only "proprietary use" of the various decimal designations. (*Id.* ¶ 3.) Republic does not dispute that non-proprietary use of "1.25" and "1.5" is permitted by the Agreement. (Republic Reply at 10 (Paragraph 5 "makes clear that CBI may use the decimals in the common manner 'as a member of the public' would, separate and apart from its proprietary use in marketing cigarette rolling papers.").) The disagreement arises over whether CBI's use of "1.25" in the trade show materials was a non-proprietary use.

CBI maintains that its use of 1.25 and 1.50 were merely descriptive as relative sizes and not proprietary. According to CBI, the descriptive use in its promotional flyer was evident from the context of the flyer, where the "JOKER" brand name was written in large font across the top of the flyer and the decimal numbers followed in smaller script along with two other size papers. The court acknowledges that the use of 1.25 might in some contexts be merely descriptive, but declines to adopt CBI's interpretation of that term, at least as used in the Settlement Agreement. Accepting CBI's understanding of the distinction between "proprietary" and "descriptive" would render Paragraph 3 virtually meaningless. Looking at the promotional flyer itself, the four products that are listed for sale are "Regular Orange," "Single Wide Double," "1.25," and "1.50." (Ex. M to Pl.'s 56.1.)

Even if the numbers relate to size[6], by referring to the products *solely* by their size, one cannot

escape the conclusion that the size is the sole identifier of the product. The "JOKER" heading at

the top of the flyer does not alter this conclusion, as the "1.25" designation appears more than half

way down the page and appears as a stand alone product. More significantly, the Agreement

anticipates this very argument: Paragraph 3's list of prohibited proprietary terms includes the terms

"1.25 size" and "1.5 size," strongly indicating that even an explicit reference to size would be

considered a proprietary use. CBI's interpretation of "proprietary" in the context of the Agreement

is thus so narrow that it would deprive the substantive prohibition of Paragraph 3 of any meaning.

In short, if CBI's use of "1.25" on its promotional materials is not the type of use contemplated by

Paragraph 3, it is difficult to imagine what was contemplated by that provision.

In a similar vein, CBI maintains that Republic has conceded that the decimal designations

are merely descriptive because its registration of the "1.0 POINT" (stylized) mark specifically

disclaimed any "exclusive right to use '1.0' apart from" the stylized mark (Ex. 13 to Def.'s 56.1) and

because the applications for trademark registration for "1.25" and "1.5" are based on claims of

acquired, rather than inherent, distinctiveness. This is unpersuasive for two reasons. First, the

registration for "1.25" does not contain the same disclaimer that the registration for "1.0" possesses.

(Ex. 3 to *id.*) Second, Republic has argued for acquired distinctiveness in the decimal designations

*in the alternative* to its argument that the designations are inherently distinctive. Making such an

alternative argument does not prejudice Plaintiff's inherent distinctiveness argument. *See*

Trademark Manual of Examination Procedures § 1212.02(c), *available at*

http://tess2.uspto.gov/tmdb/tmep (last visited March 2, 2009). Thus, Republic cannot be considered

to have conceded the lack of inherent distinctiveness. Moreover, even if Republic possessed "only"

---

[6]     Although "1.5" paper is thicker than "1.25" paper, it appears that the numbers do not
refer to any objective measurement. That is, "1.25" is not 5/4 of some objective, generally
recognizable unit, nor is "1.5" paper 20% thicker than "1.25" paper. (Remarks at 4, Ex. Y to Pl.'s
56.1.)

acquired distinctiveness in the decimal designations, it might nevertheless argue that its use is proprietary. *See H-D Michigan, Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 759-60 (7th Cir. 2007) (generic or descriptive mark may be protected by trademark laws "if it has acquired secondary meaning"). Of course, the court need not resolve here whether "1.25" and "1.5" do in fact possess such acquired distinctiveness; for purposes of interpreting the term "proprietary" in the Settlement Agreement, it is sufficient, as discussed above, that CBI's use of "1.25" at the trade show falls squarely within the conduct contemplated by the parties when they signed the Agreement.

Finally, CBI suggests a more expansive reading of this Paragraph that would treat the Paragraph as saying that CBI's rights are coterminous with the rights of the public. This reading is much too broad. If it were adopted, the Agreement would bind CBI to nothing, raising doubts about the enforceability of the contract. CBI's reading of the Agreement would effectively say that CBI is prohibited from proprietary use of certain designations unless others may make proprietary use. But this was the situation CBI was in prior to entering into the Settlement Agreement—certainly, CBI's rights were not *broader* than those of the public prior to entering the Agreement. Courts generally will not read a contract in such a way as to render the contract meaningless. *See Streator Nat. Bank v. Arquilla*, 138 Ill. App. 3d 163, 168, 485 N.E.2d 868, 871 (3d Dist. 1985); *see also Amalgamated Bank of Chicago v. Kalmus & Assocs., Inc.*, 318 Ill. App. 3d 648, 656, 741 N.E.2d 1078, 1084 (1st Dist. 2000) ("Contracts are to be construed so as to further, not hamper, the intended purpose."). The three sub-paragraphs contained in Paragraph 5 confirm that the remainder of Paragraph 5 was not intended to eviscerate the entire Agreement. The sub-paragraphs essentially lift the restrictions on use of the fractional and decimal designations only in the event that a third-party begins using those designations and Republic is unable to prevent such use. Although Paragraph 5 states that these subparagraphs do not limit the generality of the rest of the Paragraph, they still inform the proper construction of the entire Paragraph. CBI would not be prevented from using these designations if its competitors were legally entitled to do

11

so, but the Agreement as a whole still prevents CBI from making proprietary use of the decimal designations unless and until a third party successfully exercises its right to do so.

Indeed, the implausibility of CBI's suggested reading of Paragraph 5 becomes even more apparent when one considers its effect on Paragraph 4. Paragraph 4 provides that CBI will not oppose Republic's then-pending trademark registrations regarding various decimal designations. Other members of the public, however, certainly remained free to oppose those applications. CBI's suggested reading of Paragraph 5, that CBI is not entitled to anything less than the rights possessed by the public, would thus render Paragraph 4 a nullity: though Paragraph 4 bars CBI from opposing the pending applications, CBI is actually permitted to do so because other members of the public are. The court cannot accept such an illogical reading of Settlement Agreement and will not read the Agreement in such a way as to make certain provisions meaningless. *Dolezal v. Plastic & Reconstructive Surgery, S.C.*, 266 Ill. App. 3d 1070, 1081, 640 N.E.2d 1359, 1366 (1st Dist. 1994) ("a contract should be interpreted to give meaning and effect to each provision contained therein").

Paragraph 5's emphasis on ensuring CBI the same rights as those possessed by the public means two things: first, that CBI, like the rest of the public, retains the right to any non-proprietary use of the decimal and fractional designations; and second, that if Republic fails to protect its rights in these designations, or if an adjudicatory body should rule, in a suit by a third party, that it possesses no such rights, then CBI is entitled to the same rights. Neither party contends that this second meaning has any present application to the case, and, as explained earlier, CBI's use of "1.25" was proprietary. Paragraph 5 therefore does not excuse CBI's breach of Paragraph 3 of the 1979 Settlement Agreement.

### CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment to Enforce the 1979 Settlement Agreement [24] is granted, and Defendant's Cross-Motion for Summary Judgment is

denied.  As a result of this ruling, Plaintiff is entitled to nominal damages and the issuance of an

order directing compliance by Defendant with the terms of the 1979 Agreement.  The court invites

the parties to submit a draft order to the court for approval.

ENTER:

Dated: March 3, 2009

_____
REBECCA R. PALLMEYER
United States District Judge